THE CITY OF NEW YORK, Acting by the TRANSIT COMMISSION, Respondent, v. INTERBOROUGH RAPID TRANSIT COMPANY, Appellant.

In the Matter of the INTERBOROUGH RAPID TRANSIT COMPANY, Appellant, v. WILLIAM G. FULLEN et al., Constituting the TRANSIT COMMISSION, et al., Respondents.

(Argued June 4, 1931; decided July 15, 1931.)

*William L. Ransom, James L. Quackenbush, William D. Guthrie, Jacob H. Goetz* and *Louis S. Carpenter* for appellant. The Transit Commission, under section 49 of the Public Service Commissions Law, has power and jurisdiction to regulate the rate of fare of appellant. (*Gubner* v. *McClellan,* 130 App. Div. 716; *Matter of McAneny,* 198 App. Div. 205; 232 N. Y. 377; *Matter of N. Y. District R. Co.,* 107 N. Y. 42; *N. Y. & L. I. R. R. Co.* v. *O'Brien,* 121 App. Div. 819; 192 N. Y. 558; *Potter* v. *Interborough R. T. Co.,* 54 Misc. Rep. 423; *Underground Railroad* v. *City of New York,* 193 U. S. 416; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Brown* v. *Maryland,* 12 Wheat. 419; *Tinkham* v. *Tapscott,* 17 N. Y. 141; *People ex rel. N. Y. & Queens Gas Co.* v. *McCall,* 219 N. Y. 84; *People ex rel. Bridge Operating Co.* v. *Public Service Comm.,* 153 App. Div. 129; *Matter of International Ry. Co.* v. *Public Service Comm.,* 226 N. Y. 474; *Lincoln Gas Co.* v. *Lincoln,* 250 U. S. 256; *United Railways* v. *West,* 280 U. S. 234; *People ex rel. South Shore T. Co.* v. *Willcox,* 196 N. Y. 212; *Matter of Public Service Comm.* v. *Interborough R. T. Co.,* 219 N. Y. 355.) Contract No. 3 superseded the prior contracts in respect of the duration of the lease, the operation of the new system and the rate of fare thereon. (*Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110; *Matter of Evens* v. *Public Service Comm.,* 214 App. Div. 122; 246 N. Y. 224.) The elevated extension certificate does not exclude regulation and increase in elevated fares above five cents. (*City of Rochester* v. *Rochester Ry. Co.,* 182 N. Y. 99; *People ex rel. N. Y. Electric Lines Co.* v. *Squire,* 107 N. Y. 593; *Matter of City of Niagara Falls* v. *Public Service Comm.,* 229

N. Y. 333; *Matter of Wulfsohn* v. *Burden*, 241 N. Y. 288; *Buffalo East Side R. R. Co.* v. *Buffalo Street R. R. Co.*, 111 N. Y. 132; *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244.) The Public Service Commissions Law, as adopted in 1907, plainly conferred upon the Public Service Commission plenary jurisdiction to regulate rates and service upon the Manhattan elevated railroad system then being operated by appellant. (*Matter of N. Y. District R. Co.*, 107 N. Y. 42.) Statutory exception in 1910 as to through routes and joint rates on rapid transit railroads clearly recognized the existing power and jurisdiction of the Commission over rates and service on elevated lines. (*People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356; *People ex rel. Garrison* v. *Nixon*, 229 N. Y. 575; *Town of North Hempstead* v. *Public Service Corp.*, 231 N. Y. 447; *Public Service Comm.* v. *Pavilion Natural Gas Co.*, 232 N. Y. 146; *Matter of Dry Dock, etc., R. R. Co.*, 254 N. Y. 305; *People ex rel. Ulster & Delaware R. R. Co.* v. *Public Service Comm.*, 171 App. Div. 607; 218 N. Y. 643; *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244; *People ex rel. Village of South Glens Falls* v. *Public Service Comm.*, 225 N. Y. 216; *People ex rel. N. Y., W. & B. R. Co.* v. *Public Service Comm.*, 193 App. Div. 445; 230 N. Y. 604; *Matter of Evens* v. *Public Service Comm.*, 246 N. Y. 224.)

*Samuel Untermyer, Charles Dickerman Williams* and *George H. Stover* for Transit Commission, respondent. Contract 3 is so related to contracts 1 and 2, both of which antedate the Public Service Commissions Law, that the fare provisions of contract 3 are excluded from the regulatory provisions of that law. (*People ex rel. Garrison* v. *Nixon*, 229 N. Y. 575; *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244; 227 N. Y. 601; *Matter of Evens* v. *Public Service Comm.*, 246 N. Y. 224.) The Rapid Transit Act, as re-enacted subsequent to the enactment of the Public Service Commissions Law,

authorized the parties to enter into contract 3 and the certificate, and to agree therein upon a rate of fare to be in effect during the terms of the contracts. (*Southern Iowa Electric Co.* v. *Chariton,* 255 U. S. 539; *Detroit* v. *Detroit Citizens Street Ry. Co.,* 184 U. S. 368; *Detroit United Ry.* v. *Michigan,* 242 U. S. 238; *Cleveland* v. *Cleveland City Ry. Co.,* 194 U. S. 517; *Columbus Ry. & Power Co.* v. *Columbus,* 249 U. S. 399; *Omaha Water Co.* v. *City of Omaha,* 147 Fed. Rep. 1; *Public Service Co.* v. *St. Cloud,* 265 U. S. 352.) Provisions of the two statutes show that it could not have been intended that the Public Service Commissions Law should apply to Rapid Transit Act contracts. The scheme of the statutes is different. (*City of New York* v. *Brooklyn City R. R. Co.,* 232 N. Y. 463; *Reagan* v. *Farmers Loan & Trust Co.,* 154 U. S. 362; *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457; *Southern Iowa Electric Co.* v. *Chariton,* 255 U. S. 539.) Even if the regulatory provisions in the Public Service Commissions Law originally had modified or repealed the contractual provisions in the Rapid Transit Act, the rate provisions in contract 3 and the certificate nevertheless would have been authorized by the amendments to and re-enactments of the Rapid Transit Act made by the Legislature in 1912 after the enactment of the Public Service Commissions Law and before entry into the contracts. (*Village of Fort Edward* v. *Hudson Valley Ry. Co.,* 192 N. Y. 139; *Carroll* v. *McArdle,* 216 N. Y. 232; *Humphrey* v. *Parsons,* 15 N. Y. 595; *People ex rel. Stiner* v. *Morrison,* 78 N. Y. 84; *Whipple* v. *Christian,* 80 N. Y. 523; *Matter of Prime,* 136 N. Y. 347.)

*Arthur J. W. Hilly, Corporation Counsel (Edgar J. Kohler, Joseph A. Devery, M. Maldwin Fertig, Harry Hertzoff* and *Nathan R. Margold* of counsel), for City of New York, respondent. Subdivision 1 of section 49 of the Public Service Commissions Law was never intended to empower the Commission to increase the five-cent fare

provided for in contracts 1, 2 and 3. (*Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244; *Church of the Holy Trinity* v. *United States*, 143 U. S. 457; *United States* v. *Kirby*, 7 Wall. [U. S.] 482; *Matter of Dry Dock, E. B. & B. R. R. Co.*, 254 N. Y. 311; *People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356; *People ex rel. U. & D. R. R. Co.* v. *Public Service Comm.*, 171 App. Div. 607; *Sun Publishing Assn.* v. *Mayor*, 152 N. Y. 257; *Admiral Realty Co.* v. *City of New York*, 76 Misc. Rep. 345; *People ex rel. Interborough R. T. Co.* v. *Tax Commissioners*, 195 N. Y. 618; *Village of Mamaroneck* v. *Public Service Comm.*, 208 App. Div. 330; 238 N. Y. 588; *Gilchrist* v. *Interborough R. T. Co.*, 279 U. S. 159.) Subdivision 1 of section 49 had no application to the fare provision contained in the elevated extension certificate. (*People ex rel. W. S. St. Ry. Co.* v. *Barnard*, 110 N. Y. 548; *Public Service Comm.* v. *Westchester St. R. R. Co.*, 206 N. Y. 209; *People ex rel. Quinby* v. *Public Service Comm.*, 223 N. Y. 244; *Matter of International Ry. Co.* v. *Public Service Comm.*, 226 N. Y. 474; *Mayor* v. *Manhattan R. R. Co.*, 143 N. Y. 1.)

O'BRIEN, J. By this action and by this special proceeding, the single issue is presented whether authority has been conferred upon the Transit Commission to increase the rate of fare upon subway and elevated railroads operated by the Interborough Rapid Transit Company. No other question is before us.

During the sixth and seventh decades of the last century, response was first made to public demand for additional transit facilities in the old city of New York. Beginning with the experiment of the West Side and Yonkers Patent Railroad and progressing through the organizations of the Gilbert Elevated, the Metropolitan, the New York Elevated and their consolidation with the Manhattan Railway, the present system of elevated railways has been developed. Without financial contribution from government, those lines were constructed

and have always been operated by private capital. From time to time during that era of local transit expansion, was enacted a large volume of legislation which related, among other subjects, to construction, operation, supervision and rates of fare. These successive statutes culminated, by chapter 4 of the Laws of 1891, in the passage of the present Rapid Transit Act. Many of the provisions of chapter 606 of the Laws of 1875 were transferred to the Railroad Law (Cons. Laws, ch. 49.) The Rapid Transit Act of 1891, closely following in substance the law of 1875, although subjected to more than forty amendments, has never been repealed. It was under the authority of the act of 1891, as amended by Laws of 1894, chapter 752, and Laws of 1895, chapter 519 (*Sun Publishing Assn.* v. *Mayor*, 152 N. Y. 257), that, by contract No. 1, executed during the year 1900 by the city of New York acting through the Board of Rapid Transit Railroad Commissioners, the first subway extending from City Hall through Fourth avenue, Forty-second street and Broadway to Van Cortland Park and West Farms was constructed. It was also by virtue of the same act that, pursuant to contract No. 2, executed during the year 1902 by the city, acting through the same Board, a second subway extending from City Hall to Bowling Green and thence under the East river to Atlantic avenue in Brooklyn was constructed. Both subways were built at municipal expense and are owned by the city, but, by assignments from the original lessees under contracts No. 1 and No. 2, they are and since their construction have been operated by the Interborough Rapid Transit Company. No rate of fare higher than five cents has ever been charged for a continuous passage on these subways. Indeed, contracts No. 1 and No. 2, in chapter III of each contract, entitled "The Lease," expressly limit the rate to a maximum of five cents. In the year 1903 all the property of the Manhattan Railway, which then comprised the entire system of elevated lines

in the boroughs of Manhattan and The Bronx, also was leased for a term of nine hundred and ninety-nine years to the Interborough, and these elevated roads have since been operated by it. A five-cent fare had been voluntarily established by the Manhattan board of directors in 1886 and, subsequent to the enactment of chapter 743 of the Laws of 1894, it has been effective on all elevated lines. These elevated and subway roads, extensive as they were, proved inadequate to the constantly-growing passenger traffic and consequently, during the years immediately preceeding 1912, an aroused public interest producing thoughtful official discussions, centered around proposals for additional conveniences of travel.

While these public discussions and official conferences were in progress and the object and purport of a proposed new contract were known to the Legislature, the Rapid Transit Act of 1891 was again amended, this time by chapter 226 of the Laws of 1912, which became effective on April 9th of that year. This record clearly reveals that the amendments of 1912 were drafted by counsel to the Public Service Commission for the First District, that they were by resolution approved by the Board of Estimate and Apportionment of the city of New York, that they resulted from numerous conferences among members of the Commission and of the Board with officers of the Interborough and that among the dominant features of those conferences was the proposed use of all the existing rapid transit lines with such of the contemplated lines as were designed to connect with them on the basis of a universal five-cent fare. Official reports in evidence demonstrate these facts.

The Rapid Transit Act, as amended in 1912, did not in terms render mandatory the continuance of a five-cent fare on all the lines of the old and the proposed new systems. It did, however, by section 27 authorize the execution with the Interborough of the instrument

which later became contract No. 3 and it provided, in the event that such a subway contract should include a condition for operation at a single fare, that the terms of operation under contracts No. 1 and No. 2 might be extended. Of cardinal significance is the fact that by the same section 27, re-enacting the provisions of chapter 472 of the Laws of 1906, no contract by the Public Service Commission for construction and operation of subways could become effective without the approval of the Board of Estimate and Apportionment and that every such contract, subject to like approval, should include terms and conditions as to rates of fare. In respect to the elevated lines the same legislative purpose is disclosed. By section 24 approval by the Board of Estimate and Apportionment was required before any grant by the Public Service Commission for the extension of existing lines would be valid. This section also makes the locations and plans of construction and other important features of the right of extension dependent upon such " terms, conditions and requirements as to the said boards may appear just and proper." (Subd. 1.) Subdivision 2 of section 24 directs the preparation and delivery of a certificate setting forth the action taken by the Commission with respect to connecting or extending routes, tracks and facilities. Subdivision 4 defines acceptance by the corporation, in this case the Interborough, as constituting a contract between it and the city according to the terms of the certificate. When these amendments were passed, The Board of Estimate and Apportionment was known by the Legislature to be definitely committed to the principle of a five-cent fare for a single passage on all connecting lines.

On March 19, 1913, in pursuance of that amendatory legislation, the instruments known as contract No. 3, which relates essentially to subways, and the elevated extension certificate, which deals principally with elevated railroads, upon both of which a practical agreement

had been reached prior to the passage of the enabling act, were formally executed.

The parties to contract No. 3, executed pursuant to the provisions of the Rapid Transit Act, are the city of New York, acting by the Public Service Commission for the First District as successor to the Board of Rapid Transit Railroad Commissioners (Laws of 1907, ch. 429, § 5, subd. 6), and the Interborough Rapid Transit Company. To this contract the Board of Estimate and Apportionment gave its approval. Without it, under section 27, as amended by chapter 226 of the Laws of 1912, no contract would be valid. Its general scheme provides for the construction, equipment and operation of approximately fifty miles of new subways. The first of these five additions connects with the old subway at Atlantic avenue, Brooklyn, and extends several miles beyond the former terminus. The others connect: at Forty-second street and Broadway, Manhattan, thence extending through Seventh avenue to the lower part of that borough and under the East river to Borough Hall, Brooklyn; at Forty-second street and Broadway, along Forty-second street and through the Steinway Tunnel into the borough of Queens; at Grand Central Station along Lexington avenue, thence under the Harlem river into the borough of The Bronx; at West Farms and extending in a northerly direction. By article 1 the parties agree upon " the modification of Contract No. 1 and Contract No. 2 in the respects herein set forth, but nothing in this contract shall be construed as a modification or waiver of any of the rights or obligations of the respective parties under Contract No. 1 and Contract No. 2 except in the respect and to the extent specifically set forth." By the same article, the Interborough agrees to contribute toward the cost of construction of the new subways, to equip them and to operate them in conjunction with the old for a single fare. Under article IX its contribution for construction was estimated at $58,000,000, and for

equipment at $22,000,000. The city paid $113,000,000. Article LIX provides that the old subways constructed under contracts No. 1 and No. 2 and the new ones to be built under contract No. 3 shall be operated by the Interborough as one complete system and that free transfers shall be given, as required by the Commission, so as to afford a continuous trip for a single fare. Article LXII restricts the fare on the old and new lines to " the sum of five cents but not more."

The elevated extension certificate, issued by the Public Service Commission after approval by the Board of Estimate and Apportionment, authorizes the Interborough, at its own expense, to construct, equip and operate " Railroads." This term is defined in the certificate as the four new roads to which reference is therein made as the Webster Avenue Line; the Eighth Avenue and 162d Street Connection; the Queensboro Bridge Line; the West Farms Subway Connection. These " Railroads " are extensions of the Second, Third and Ninth avenue elevated lines of the Manhattan Railway Company and connect with subway lines. Article VI directs that the Interborough shall be entitled to charge for a single fare " the sum of five cents but not more " for a continuous trip over the railroads " including the parts of the municipal railroad over which the Interborough Company is provided with trackage rights as in this certificate provided." In article IX provision for such trackage rights is made. On the same day an instrument known as the additional track certificate was also issued to the Interborough. It gives the right to construct third tracks on the Second, Third and Ninth avenue elevated lines.

Notwithstanding the fact that the power, by which contract No. 3 was made and the certificate was issued only after approval by the Board of Estimate and Apportionment, springs from the Rapid Transit Act and not from the Public Service Commissions Law (Cons. Laws,

ch. 48), appellant argues that section 49 of the Public
Service Commissions Law confers upon the Transit Com-
mission, as successor to the Public Service Commission
for the First District (Laws of 1907, ch. 429, § 5, subd.
6; Laws of 1921, ch. 134), authority to alter the rate of
subway fare upon which agreement was reached in con-
tracts No. 1 and No. 2 and in the most unmistakable
terms reasserted and again accorded in contract No. 3
and the equally certain rate approved in the elevated
certificate. Whatever regulatory jurisdiction there may
be over street railways and other common carriers in
the city of New York is now vested in the Transit
Commission whose duty it is to administer the Public
Service Law, but this body possesses no larger measure
of authority in respect to fares than the power which
had been conferred upon its predecessor by section 49
of the Public Service Commissions Law. Since the
enactment of the original Public Service Commissions
Law by chapter 429 of the Laws of 1907, the Rapid
Transit Act of 1891 has run parallel with it. The later
statute is operative throughout the entire State, but the
Rapid Transit Act, in form general and in terms applicable
to all cities of one million inhabitants, is in fact effective
only in the territory included within the city of New
York. Nevertheless, it is not " a special city law."
(*Admiral Realty Co.* v. *City of New York,* 206 N. Y.
110, 140.) We refrain from discussing the validity of
an increase in fare if one should be made by the sovereign
State in the future exercise of some possible legislative
right to regulate during the terms of the contract and the
certificate. . We think that such a question is not now
before us and so we limit our consideration to the effect
of existing legislation. Those parts of the final judgment
under review which order " permanently " the specific
performance of contract No. 3 and the elevated exten-
sion certificate and which " permanently " enjoin defend-
ant from charging a fare in excess of five cents are inter-

preted by us to indicate merely a reference to the time during which the present statute is in effect.

Consider first the question whether power now resides in the Transit Commission to alter the rate of fare on subways. On March 19, 1913, when the city entered into contract No. 3 with the Interborough, section 49 of the Public Service Commissions Law, as amended by chapter 546 of the Laws of 1911, read in substantial part as follows: " Whenever either commission shall be of opinion * * * that the maximum rates, fares or charges * * * are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall * * * determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order * * *." On its face this section seems to be very broad but its words may be susceptible of varying interpretation. Although no reference is made to a lower rate fixed by statute and no mention occurs of a rate, either higher or lower, fixed by contract, a strong argument could, perhaps, be advanced, if the question were still open, that section 49 supplied plenary power to the Public Service Commission, and now to its successor the Transit Commission, to alter rates whether fixed by statute, contract, franchise or by any other method. Doubtless the functions conferred upon the legislative delegate include the power to regulate rates fixed by statute (*Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244, 263; *Matter of Dry Dock, etc., R. R. Co.*, 254 N. Y. 305, 315), those fixed in municipal franchises granted prior to January 1, 1875, and by franchises granted directly by the Legislature. (*People ex rel. Garrison* v. *Nixon*, 229 N. Y. 575; *Matter of Evens* v. *Public Service Comm.*, 246 N. Y. 224, 228.) Since the

date of contract No. 3, section 49 has several times been amended but most of the amendments have been repealed (Laws of 1921, ch. 134; Laws of 1922, ch. 153; Laws of 1923, ch. 891). To-day, with one slight exception, its phraseology, as quoted, has been restored. The expression " authorized by statute " has been changed to " authorized by general or special statute." (Laws of 1921, ch. 134.) By chapter 134 of the Laws of 1921 the word " contract " was inserted, but by chapter 891 of the Laws of 1923 it was displaced. The same hiatus, at least in words, respecting contracts, therefore, remains. In 1918 *Matter of Quinby* v. *Public Service Comm.* (*supra*) was decided. We held that rates which had been fixed by contracts executed prior to the enactment of the Public Service Commissions Law were not so clearly within the regulatory power created by section 49 as to require an inference of legislative intent to include them. This was true, at the very least, as to consents exacted by the Constitution (Art. III, § 18) and the rationale of the decision apparently includes all prior consents, whether of constitutional origin or not, for any distinction between them would have amounted to a remaking of the statute. Two years later we decided in another case that in respect to contracts executed subsequent to the regulatory law, the intent is more clearly capable of an opposite inference. The obligation of a contract, even more especially one subject to the operation of the police power, is determined by the law in force when it is made. Generally, statutes then existing are read into the contract and municipalities may not by their contracts nullify laws already passed. Yet, " contracts made after the passage of the statute (Consol. Laws, ch. 48) may conceivably be so related to earlier contracts either by words of reference or otherwise as to be subject to the same restrictions." (*People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356, 362.) When

numerous franchises are brought together by consolidation and are operated as a single system, then in the event that a small portion only of the merged line may be considered outside the purview of section 49, the difficulties of administration by public authorities over such a mixture of franchises may result as matter of public policy in the inclusion of the united system. (*Matter of Evens* v. *Public Service Comm., supra.*) If the action of the city and the Interborough in entering into contract No. 3 constituted such a specific modification of contracts No. 1 and No. 2 as to supersede the agreement in relation to the five-cent fare in those earlier contracts, then contract No. 3 in its essence might constitute a new contract made subsequent to the enactment of section 49 and, therefore, might be subject to regulation by the Transit Commission. Our opinion is, however, that instead of superseding or modifying the provisions of the old contracts in respect to rate of fare, the new contract merely adopted them, extended them to itself and incorporated them within itself. This explicit saving clause in contract No. 3 is so significant that difficulties too weighty to be overcome would be met in an endeavor to read it except in a literal sense; "Nothing in this contract shall be construed as a modification or waiver of any of the rights or obligations of the respective parties under Contract No. 1 and Contract No. 2 except in the respect and to the extent specifically set forth." Specifically set forth are modifications of the terms of the leases, of operation, of rentals and of the character of service. Assuming that the right of the city to limit the fare to five cents and the obligation of the Interborough to exact no more, as provided by the old contracts, could reasonably be held to have been waived by implication in contract No. 3, because the carrier agreed to haul passengers a longer distance without additional compensation, certainly no waiver of this right nor of this obligation was "specifically set forth." On the contrary, the right and

the obligation were expressly reasserted and reaffirmed. The terms of the new contract were drafted in such form as deliberately to exclude any possibility of modification by implication. When the reports of the conference committee of the Board of Estimate and Apportionment reflecting an insistent and persistent policy toward the preservation of the five-cent fare are considered in connection with the acquiescent attitude of the Interborough officers during the process of formulating the terms of contract No. 3, no purpose more remote from nullification or supersession or the slightest modification of such a policy is conceivable. We hold that the possibility of an intimate relationship and a substantial bond of union between contracts executed respectively before and after the passage of section 49, the nature of which was envisioned and presaged by the opinion in the *Nixon Case* (*supra*), has matured into a reality. Not only are these contracts akin, " by words of reference," but they are connected by every circumstance which brought them forth. Moreover, attaching grave import to the provisions of section 27 of the Rapid Transit Act, as amended by chapter 226 of the Laws of 1912, which required approval of contract No. 3 by the Board of Estimate and Apportionment as a condition precedent to its validity, and giving weight also to the somewhat kindred provisions of chapter 641 of the Laws of 1925, which added section 112 to the Public Service Commission Law, we must conclude, until language more comprehensive than that in section 49 is used, that no legislative intention has been definitively expressed that another administrative body, without municipal consent, might through the force of section 49, afterward destroy the substance of that contract.

Considering now the question of fares on the elevated lines, even though they might be held to have resulted from the provisions of chapter 743 of the Laws of 1894, we reach the conclusion that, partly owing to the com-

pact link in through transit operation between them and the subways, and also in large degree owing to the other factors which influence our judgment in respect to subway fares, the sovereign's intent to delegate its power of alteration, if such power exists, has not been adequately displayed by any legislation now effective. To allow a change of the rate of fare on the elevated roads and to deny it on the subways might tend to work disruption of the general plan embraced within contract No. 3 and the extension certificate. Although expressions of the detailed purposes of these instruments are incorporated in separate documents, they were executed on the same day and are so interlocked and combined in their common scheme, so inextricably interwoven, that each must be regarded only as part of an integral transaction. Each recites the fact that it is executed under the authority of the Rapid Transit Act. Article III of the contract emphatically repeats that the Rapid Transit Act " is to be deemed a part hereof as if incorporated herein." The certificate contains at least three affirmations of the controlling force of the Rapid Transit Act and in no instance does it allude to any other statute as the source of power by which it is issued. The inter-mingling of the subject-matter of the two instruments and the extent of the contemplated union in operation of the elevated and subways systems are demonstrated by article LXIX of the contract and by articles VI and IX of the certificate. This is the language of the contract: " * * * the City reserves the right for the Lessee, as the operator and lessee of the railroads owned by the Manhattan Railway Company, (and for the successors and assigns of the Lessee) upon the terms hereinafter stated, to use the tracks, structures and line equipment of Subdivision II of the Lexington Avenue Branch, of the White Plains Road Line and of the Queensboro Bridge Plaza portion of the Subdivision II of the Steinway Tunnel Line and of Subdivisions III, IV and V of the Steinway Tunnel Line

or of any of them or of any Extensions thereof." Article VI of the certificate provides: " The Interborough Company shall be entitled to charge for a single fare for each passenger for one continuous trip in the same general direction over the Railroads (including the parts of the municipal railroad over which the Interborough Company is provided with trackage rights as in this certificate provided) and the additional tracks (which shall mean the additional tracks authorized by the Commission by certificate to the Manhattan Railway Company bearing even date herewith) and the Manhattan Railroad the sum of (5) cents but not more. A trip from any point on the Queensboro Bridge Line (including the part of the municipal railroad over which trackage rights are provided) to any point on the Manhattan Railroad or on the Railroads, or a trip from any point on the Manhattan Railroad or on the railroads to any point on the Queensboro Bridge Line (including the part of the municipal railroad over which trackage rights are provided) shall be deemed a continuous trip in the same general direction." In article IX of the certificate are embodied these words: " The City also agrees to provide the Interborough Company with trackage rights over parts of the municipal railroads to be constructed and to be equipped, maintained and operated under a contract bearing even date herewith between the City and Interborough Rapid Transit Company and over any extensions of such parts, and the Interborough Company as grantee under this certificate agrees to operate over such parts in conjunction with the Railroads to the end that through service may be provided over such parts over the Railroads and over the Manhattan Railroad." Then follows in the same article a description of the parts affected by this stipulation. These parts are long sections of several miles in the boroughs of Queens and The Bronx where the subways emerge from the subsurface and are carried on elevated structures. Separation of rates on

a continuous trip partly over elevated lines and partly over subway lines, as these roads are defined in the contract and in the certificate, not only would seriously interfere with the avowed purpose of these instruments but, in addition, would create difficulties in administration similar to those which were recognized in *Matter of Evens* v. *Public Service Comm.* (*supra*). The Legislature has not plainly told us that it intended such a result.

The power of the Transit Commission cannot be taken by implication. It must be given by language which admits of no other reasonable construction. (*Siler* v. *Louisville & Nashville R. R. Co.*, 213 U. S. 175.) Even if, as an original proposition, section 49 might have been held to exhibit such clarity of legislative intent as to warrant the inference that its purpose was to vest administrative officials with jurisdiction over the alteration of rates after this gravely impressive contract was executed and this certificate was issued, such a time is now long past. Twice prior to the present litigation has this appellant petitioned the Commission to increase its fares and twice, for lack of power, have its petitions been denied. Appellant has presented a memorial to the Legislature and that body has refused to change its mandate. On occasions, the legislative branch of government, of its own volition, has temporarily adopted measures (Laws of 1921, ch. 134; Laws of 1922, ch. 153) which, if acted upon by appellant, might perhaps have afforded it some measure of relief. At the behest of the Governor, that possibility of relief was withdrawn (Laws of 1923, ch. 891) and section 49 was restored to the form which it had assumed when the contract and certificate were made. The insertion by chapter 134 of the Laws of 1921 in section 49 of the words " contract, grant, franchise condition, consent or other agreement " and their removal therefrom by chapter 891 of the Laws of 1923 is most impressive as an indication that since 1923, at least, the Legislature has not intended that power

to change rates fixed by contract, except as defined in
*People ex rel. City of New York* v. *Nixon* (*supra*), shall
rest with the Transit Commission. The legislative
construction of this statute (*Matter of City of Niagara
Falls* v. *Public Service Comm.*, 229 N. Y. 333, 340) has
been adverse to appellant's contention. Under the cir-
cumstances, courts ought not to interpret it differently ·
from the body which produced it. " In the absence of
clear and definite language conferring without ambiguity
jurisdiction upon the public service commission to increase
rates of fare agreed upon by the street railroad and the
local authorities we should not unnecessarily hold that
the legislature has intended to delegate any of its powers
in the matter, whatever its powers may be." (*Matter
of Quinby* v. *Public Service Comm.*, 223 N. Y. 244,
263.) It would be a strained construction of section 27
of the Rapid Transit Act, as amended by the act of 1912,
that would permit the Public Service Commission, after
contracting subject to the approval of the Board of
Estimate and Apportionment, to make, perhaps the next
day, a different contract without reference to that
approval. Such a construction, a strained one, even if
the act of 1912 be considered by itself, becomes wholly
inadmissible when it is viewed in the light of later
legislation. Not even in a readjustment of the transit
situation is the Commission, in the absence of the con-
sent of the municipal authorities, to have power to change
existing contracts. (Laws of 1925, ch. 641; Public Service
Commission Law, § 112.)

The extremely voluminous records and the thousand
and more pages of briefs filed by learned and zealous
counsel and embracing the most thorough discussion of
the many serious points of law in this important litiga-
tion have received our earnest attention and study.
After all, as we view the case, these arguments necessarily
revolve about the purpose of section 49 of the Public
Service Commissions Law. Stress upon matters of mere

practice and procedure has been avoided by us, but we have taken these cases on their merits. Intentional absention from prolonging the expression of our opinion concerning each of the arguments to which we have given deliberate consideration is due only to a desire to condense our conclusions and to concentrate them in such degree as may be possible. We feel confident that no essential argument advanced by any party has been overlooked.

The judgment in the action and the order in the special proceeding should be affirmed, with costs.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, KELLOGG and HUBBS, JJ., concur.

Judgment and order affirmed.