[No. 27673. Department Two. April 10, 1940.]

THE STATE OF WASHINGTON, *on the Relation of Kitsap County Transportation Company et al., Respondents,* v. KING COUNTY *et al., Appellants,* PUGET SOUND NAVIGATION COMPANY *et al., Respondents.*[1]

[1]Reported in 101 P. (2d) 327.

*B. Gray Warner, Patrick M. Tammany, Fairbrook & Williams,* and *Elliott W. Reynolds,* for appellants.

*Bogle, Bogle & Gates* and *Edward G. Dobrin,* for respondents Kitsap County Transportation Company *et al.*

*The Attorney General* and *Don Cary Smith, Assistant (Will M. Derig,* of counsel), for respondent Department of Public Service.

BLAKE, C. J.—This is an appeal by King county and Vashon Island Commercial Club from a judgment of the superior court of Thurston county affirming an order of the department of public service by which rates were fixed for ferry service on the Fauntleroy-Vashon Heights-Harper route. While only two questions are presented for determination, it is necessary, in considering them, to have a comprehensive view of the historical background and economic conditions from which they arise.

Some time prior to 1921, King county established a ferry route between the Marion street dock in Seattle and Vashon Heights and Harper. December 8th of that year, King county entered into an agreement with Kitsap County Transportation Company whereby the latter acquired the right to the use of the docks and

two steam ferries owned and used on the route by King county for a term of ten years. The agreement provided minimum service and maximum fares. The county reserved the right to modify the route "so that another Seattle Terminal . . . shall be located at some suitable location between Alki Point and Three Tree Point." In 1925, such a terminal was established at Fauntleroy cove, and service has ever since been maintained between that point and Harper, touching at Vashon Heights, first, both ways.

On December 27, 1927, King county and Kitsap County Transportation Company entered into a contract covering ferry service on the two routes: Harper to the Marion street dock and Fauntleroy-Vashon Heights-Harper.

In passing, we shall, at this juncture, dispose of a point which appellants seem to think of some importance. It is their contention that this contract is but a renewal or extension of the contract of December 8, 1921. We think that, in view of the following paragraph of the later contract, the position of the appellants on this point is so clearly untenable that it does not merit discussion. Section 29 of the 1927 contract provides:

"It is understood and agreed that the lease dated December 8, 1921, between the County and the Company, hereinbefore referred to, is terminated and at an end as of close of business, 1927; and each party acknowledges full and complete performance of all the terms, conditions and provisions thereof by the other party."

The contract of 1927 provided for maintenance of a minimum of service on each route and a maximum of fare rates. Owing to the shortness of the run and the distance of the Fauntleroy dock from downtown Seattle, the fare rates for all classes of traffic were sub-

stantially less on the Fauntleroy - Vashon Heights-Harper route than on the Harper-Vashon Heights-Marion street dock route. Yet the former route has, at all times, proved to be a very profitable operation.

In 1935, all of the voting stock of Kitsap County Transportation Company was acquired by Puget Sound Navigation Company. These two companies own all the stock of Washington Route, Inc. The three companies comprise what is known as the "Black Ball Line," operating ferries on many routes: to the islands in Puget Sound, and to various points on the Olympic Peninsula. The eastern termini of nearly all these routes are within the metropolitan area of Seattle. The only one of these routes (other than the Fauntleroy-Vashon Heights-Harper) with which we are concerned on this appeal is the Manchester-Seattle route, having its eastern terminus at the Colman dock and its western at Manchester, in Kitsap county. Owing to the close proximity of Harper and Manchester, these are essentially competing routes. Prior to 1937, however, rates for all classes of traffic were substantially lower on the Harper-Vashon Heights-Fauntleroy route than that from Manchester to the Colman dock. This differential may be ascribed to two factors: (1) a difference in mileage in the water carriage; (2) a difference of eight miles to the downtown center of Seattle between the landings at Colman dock and Fauntleroy —attended, as the latter landing was, by the bus, street car fare or cost of gasoline to traverse the eight miles.

In the latter part of May, 1937, a strike was called and effectuated, tying up the ferries of the Black Ball Line for a period of several weeks. Through the mediation of the governor, the strike was settled upon terms by which the Black Ball Line's annual cost of operation was increased $169,000, on account of additional labor charges. As a part of the settlement, the

companies were permitted to put in effect an increase of rates designed to absorb this increase in cost of operation.

Upon settlement of the strike, the department of public service immediately began a survey of the entire problem of ferry transportation on Puget Sound. This investigation resulted in an order by the department permitting Puget Sound Navigation Company and its affiliates to increase fares on all its routes in an amount sufficient to absorb the increased cost of operation which attended the settlement of the strike. In determining the amount of increase of fares on the various routes, the department treated the operation of the Black Ball Line as a united system.

Prior to the investigation from which this order resulted, the department had been considering the problem as to whether rates should be based upon a consideration of ferry transportation as an integrated operation or whether they should be based on the experience of each individual route.

In its Fifteenth Report, the department said:

"A great deal of our time is being claimed by numerous difficult problems affecting the operation of ferries on Puget Sound. Ferry operations on many routes do not pay and cannot be made to pay. Yet service to the islands in the Sound and the Olympic Peninsula is absolutely essential. . . .

"Our investigations have disclosed that several ferry routes on Puget Sound are not self-supporting. Some of these routes are separately owned, while others are owned by companies who also operate on routes which undoubtedly are at least self-supporting. The question then is whether the Department is compelled to consider each route by itself. If that is the rule which must be applied, it is certain that we cannot compel the continuance of a number of operations now in existence. *On the other hand, if the Department may consider together all of the operations of any one company, it*

*is possible that some unprofitable routes can be con-*
*tinued because they will be carried by profitable routes*
*operated under common ownership. . . .*

"The matter of ferry service presents a social prob-
lem as well as an economic problem. . . ." (Italics
ours.)

And in the order under review, the department
found:

"When establishing rate bases, rates, services, and
practices shall we deal with each route independently
of all other routes? If not, shall we deal with the
routes of each corporation as a group independently
of the routes of the other corporations? Or shall we
consider all the routes of all the corporations as one
complete transportation system? These questions are
squarely raised in Cause No. 7040, as well as in Causes
No. 6970 and No. 7036, which are consolidated herein.
They must be answered before we can determine values,
rates, service and practices. . . .

"The transportation problems of the Puget Sound
Area generally, are not the problems of any particular
locality or of any particular route. Our habit of moving
about freely and frequently and the enlargement of the
situs of our business and social activities make the
resident of Bellingham neighbor to the citizen of
Bremerton, and the dairyman at Sequim. All of us
need adequate service in all parts of the Sound country.
One may travel the Vashon route today, use the Brem-
erton service tomorrow, the Ballard-Ludlow route an-
other time, and journey to Orcas Island for the week-
end. The Vashon Island resident who works in Seattle,
or sells his produce in its markets is vitally interested
in the development of all the territory which both sup-
ports and is dependent upon the metropolis. Whether
he realizes it or not he is deeply concerned with the
problem of promoting and maintaining adequate trans-
portation facilities in all parts of the Sound country.
No one community or area lives in, of, and by itself.

"What we have said applies with particular force to
all the operations which serve Seattle directly, and a
reference to the map will show that practically all of

the routes involved in this proceeding have their eastern termini within the city limits or nearby. . . .

"It is well to remember also that several routes operated by a single management might be compelled to carry much heavier financial burdens if they were separately owned and operated. Ordinarily managerial, administrative, traffic and other general expenses are less per unit of business if a number of separable but related operations are jointly handled. Then, too, the expense of providing standby equipment is lessened if routes are not entirely divorced from each other. Undoubtedly, the several routes of a corporation may reap many other advantages from their close association in the family and properly may be called upon reasonably to support the family as a whole and all its members. . . .

"After full consideration of the matter we have come to the conclusion that, with certain limitations, we should not consider each route independently and that for certain purposes we should consider the operations of affiliated corporations as a whole, and that for some purposes we should consider all of the operations on Puget Sound as one complete transportation system devoted to the public service. . . ."

The conclusion of the department to regard the Black Ball Line as an integrated operation resulted in treating the Manchester-Colman dock and the Harper-Vashon Heights-Fauntleroy routes as competitive. In consequence, fares were raised on the latter to a parity with fares on the former. This resulted in a much higher percentage of increase on the latter route than on the former—an increase plainly unjustifiable, if the Harper-Vashon Heights-Fauntleroy route were considered as a separate operation. For, as we have said, that operation has always been profitable. Considered alone, it was, before the increase of rates, returning a high rate of interest on the investment in equipment and property used in the operation.

■ The first question for determination, then, is: Did the department act arbitrarily or on a fundamentally wrong basis in fixing rates on the basis of the integrated operation of the Black Ball system? For only in such case is the court warranted in modifying or setting the order aside. *New York & Queens Gas Co. v. McCall,* 245 U. S. 345, 351, 62 L. Ed. 337, 38 S. Ct. 122; *State ex rel. American Telechronometer Co. v. Baker,* 164 Wash. 483, 2 P. (2d) 1099.

That transportation by ferry on Puget Sound presents an economic and social problem, is too obvious for discussion. As indicated by what we have quoted from the department's order and reports, the problem presents variant and interrelated aspects. One phase of it in connection with the particular situation with which we are now concerned is the effect the pre-existing differential in rates between the Manchester-Colman dock and the Harper-Vashon Heights-Fauntleroy routes had upon vehicular traffic. Harper and Manchester are small communities—little more than landings—on the Kitsap Peninsula. They are but a few miles apart. In and of itself, neither offers enough traffic to justify ferry service. But each affords a gateway to the same hinterland from which the bulk of the traffic comes.

Prior to the leveling of rates on the two routes, it was a frequent occurrence for the ferry at Harper to leave with a capacity load, while that from Manchester would leave half empty. Aside from the effect that this condition had upon the comparative profit and loss shown on the two routes, it had a direct effect upon the service rendered to Vashon Island patrons. For, of course, when the ferry left Harper with a full load, it could not accommodate vehicles waiting at the Vashon Heights docks. This meant delay for them and extra trips to Fauntleroy for the ferry. A com-

parative study of traffic statistics before and after the leveling of rates on the two routes, indicates that the new adjustment in rates will partially, if not wholly, ease this undesirable traffic condition.

Further than that—it goes to show that the problems of the various routes are interrelated and cannot be solved by fixing rates based solely upon a calculation of a fair return upon capital prudently invested in equipment and property used on each route as a separate entity. As pointed out in the department's order, the establishment of rates upon the fair return theory, applied to the routes separately, would inevitably lead to the abandonment of some of them. This, of course, would affect the entire sound country—leading to the retarding of development of some districts and resulting in a corresponding gain to others. We are convinced that the department, in fixing rates, was justified in treating the "Black Ball Line" as an integrated operation not only by the social and economic aspects of the problem of ferry transportation on Puget Sound, but by legal precedent as well.

What we regard as the identical problem, has been presented to the courts with respect to the operation of railroads, street railways, electric power and light and gas companies. *Puget Sound Traction, Light & Power Co. v. Reynolds,* 223 Fed. 371; *Puget Sound Traction, Light & Power Co. v. Reynolds,* 244 U. S. 574, 61 L. Ed. 1325, 37 S. Ct. 705; *United R. & E. Co. v. West,* 280 U. S. 234, 74 L. Ed. 390, 50 S. Ct. 123; *In re Evens v. Public Service Commission,* 246 N. Y. 224, 158 N. E. 310; *O'Brien v. Board of Public Utility Commissioners,* 92 N. J. L. 44, 105 Atl. 132; *St. Louis & S. F. R. Co. v. Gill,* 156 U. S. 649, 39 L. Ed. 567, 15 S. Ct. 484; *Railway Co. v. Gill,* 54 Ark. 101, 15 S. W. 18, 11 L. R. A. 452; *Groesbeck v. Duluth, S. S. & A. R. Co.,* 250 U. S. 607, 63 L. Ed. 1167, 40 S. Ct. 38; *New York & Queens Gas*

*Co. v. McCall,* 245 U. S. 345, 62 L. Ed. 337, 38 S. Ct. 122; *State v. Lone Star Gas Co.,* 86 S. W. (2d) (Tex. Civ. App.) 484; *Lone Star Gas Co. v. Texas,* 304 U. S. 224, 82 L. Ed. 1304, 58 S. Ct. 883; *Milwaukee Electric R. & L. Co. v. Railroad Commission,* 171 Wis. 297, 177 N. W. 25.

In these cases, the problem has come up in various ways, but it has always been determined by treating the carrier's or utility's entire operations as an integrated system—sometimes to its advantage and sometimes to its disadvantage.

Appellants cite two cases which they conceive to hold otherwise: *International R. Co. v. Prendergast,* 1 Fed. Supp. 623; *Gilchrist v. Interborough R. T. Co.,* 279 U. S. 159, 73 L. Ed. 652, 49 S. Ct. 282.

The former case is rather in than out of harmony with the cases we have cited. There, the carrier operated street railway systems in three different cities and also interurban railways. Only the rates to be charged in one city were involved. The court held that, in fixing the rates, neither the street railway systems in the other cities nor the interurban system should be taken into consideration, saying: "The commission had theretofore treated the system in like manner, with the plaintiff's acquiescence." The order of the commission, however, did include, as a part of the street railway system, an industrial line connected with it, which extended beyond the limits of the city, and this aspect of the order the court approved.

While in the *Gilchrist* case, it was said, "Upon the record before us we cannot accept the theory that the subways and elevated roads constitute a unified system for rate-making purposes," that issue was not decided. The Interborough Co. operated a system of subway and elevated railroad lines in New York City, a number of which had been operated originally as separate

units. The action was brought by it to restrain the city and the Transit Commission "from requiring, or attempting to enforce, further acceptance by the [company] of a five cent passenger fare over the lines operated by it and from seeking to prevent a charge of seven cents." A three-judge district court granted an interlocutory injunction. The supreme court reversed the order on the ground that the action raised questions of state law which had not been settled by the state courts, and relegated the controversy to the courts of the state of New York. Again the issue was not decided when the controversy reached the court of appeals of New York. *New York v. Interborough R. T. Co.*, 257 N. Y. 20, 177 N. E. 295. But explicitly the opinion in that case recognizes the propriety of treating the subways and elevated railways in the city of New York as an integrated system for rate-making purposes, citing *In re Evens v. Public Service Commission, supra.*

We are of the view that the department, in fixing the rates, did not act capriciously or on a fundamentally wrong basis in regarding the Black Ball Line as a united system.

 The other question raised by appellants is that, in view of the contracts between King county and the Kitsap County Transportation Company, the department had no jurisdiction to establish rates on the Fauntleroy-Vashon Heights-Harper route. In those contracts, the county and the company agreed upon maximum rates. Admittedly, the rates established by the department's order are in excess of the maximum rates agreed upon in the contracts.

Prior to 1927 it was held that the public service commission act of 1911 (chapter 117, p. 538) did not repeal any part of the ferry law (Laws of 1854, p. 353, as amended from time to time) which gave jurisdiction to

local authorities over ferry operations. *State ex rel. Allen v. Public Service Commission,* 111 Wash. 294, 190 Pac. 1012. By Laws of 1927, chapter 248, p. 382, the legislature brought ferry operations under the jurisdiction of the department of public works. Construing that act in *State ex rel. Scofield v. Schaaf,* 185 Wash. 354, 54 P. (2d) 1014, we held that, if such a

". . . contract or contracts purport to affect the rights of the public with respect to rates, charges and facilities charged and furnished by the [ferry], the answer is that such contracts between a municipality and a common carrier or public utility are subject to the reserved or police power of the state, under which the legislature may give jurisdiction to a state department, such as the department of public works, notwithstanding such prior contracts."

Appellants, recognizing that that case is decisive of the issue now under consideration, ask us to reconsider the issue and overrule the case. We have heretofore had occasion to reconsider that case, and have not only declined to overrule it, but have recognized its authoritative force. *State ex rel. Washington Nav. Co. v. Pierce County,* 187 Wash. 695, 60 P. (2d) 16. That decision was upon a rehearing *En Banc.* The first hearing—also *En Banc*—was had before the decision of the *Scofield* case. *State ex rel. Washington Nav. Co. v. Pierce County,* 184 Wash. 414, 51 P. (2d) 407. While the question of rates was not involved in that case, much was said in the first opinion which lends support to the contention appellants here make that chapter 248, Laws of 1927, did not divest the board of county commissioners of the power to establish by contract rates upon ferries operated under franchise granted by the county. Upon the rehearing, however, the court repudiated that portion of the opinion on the first hearing, saying:

"Upon further consideration it is decided that all of that portion of our former opinion in this case inconsistent with the opinion in *State ex rel. Scofield v. Schaaf, supra,* be and the same is hereby overruled."

And, now, after again reconsidering the jurisdiction conferred upon the department of public works by chapter 248, Laws of 1927, we adhere to the conclusions announced in *State ex rel. Scofield v. Schaaf, supra.*

Judgment affirmed.

JEFFERS, BEALS, STEINERT, and GERAGHTY, JJ., concur.

[1]Reported in 101 P. (2d) 316.