In the Matter of QUEENS-NASSAU TRANSIT LINES, INC., et al., Petitioners, against MILO R. MALTBIE et al., Constituting the Public Service Commission of the State of New York, Respondents.

Supreme Court, Special Term, Albany County, April 3, 1946.

*Harold J. Cloutman* for Queens-Nassau Transit Lines, Inc., petitioner.

*Mudge, Stern, Williams & Tucker* for Staten Island Coach Co., Inc., petitioner.

*Shearman & Sterling & Wright* for New York City Omnibus Corp. and others, petitioners.

*Jacob I. Goodstein* for East Side Omnibus Corp. and another, petitioners.

*Walter R. Hart* for Green Bus Lines, Inc., and another, petitioners.

*George H. Kenny, Samuel R. Madison, Philip Hodes* and *Philip Halpern* for respondents.

BERGAN, J. The petitioners are nine companies operating bus lines in New York City. The rate of fare charged is five cents. The Public Service Commission, which has supervision over bus lines and jurisdiction over rates of fare to be charged, has begun an inquiry to determine whether the present volume of passenger traffic and revenue would justify a reduction of the fare below five cents.

The bus companies have taken the view that the commission has no power to direct a reduction of the fare because the rate of five cents is fixed in the franchise contracts between the City of New York and the companies. Since the rate proceedings would be long and expensive, the companies select the modern adaptation of the writ of prohibition (i.e., the remedy now given by Civ. Prac. Act, § 1296, subd. 2), to challenge the jurisdiction of the commission to reduce the fares. The remedy is appropriate. If the commission would, in the end, have no power to reduce the fares, that ought to be determined before a long and difficult examination is made into the underlying facts. The preliminary procedural questions referred to in the memorandum of January 30, 1946, have now been disposed of, and a trial of the issues raised in the Queens-Nassau case was held on February 18th. The other petitions are tested by the respondents' motions to dismiss.

The power to fix utility rates, including fares for public transportation, being by common agreement among all lawyers a legislative function, the New York State Constitution places it in the Senate and Assembly (art. III, § 1). It is a kind of legislative power which in the nature of things must be delegated in a large commonwealth if it is to be exercised wisely. While this power may be delegated to local authorities in respect of local fares and rates, neither its source nor nature is local and the rate-making power is essentially a State and not a city function. By a long, well-marked policy in relation to this branch of its own power, the Legislature has consistently delegated the rate-making function to State agencies of its creation.

It seems to have been the conclusion of the Legislature, reached through many years of experience with the subject, that in the interest of the general welfare the fare-making and rate-making power should be in the State government rather than in the local governments. While the cities control the conditions under which their streets shall be used for bus lines and may make enforcible contracts in their franchise agreements, the provisions of such contracts must yield, if inconsistent, to the exercise of the State's power to fix rates of fare. (*People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356.)

The enactment in 1931 of article 3-A of the Public Service Law (L. 1931, ch. 531) provided an integrated statute for the regulation of bus lines by the Public Service Commission, but similar jurisdiction had existed under other provisions of the statute for some years. The commission has the power to fix just and reasonable rates of fare (§ 61, subd. 5). Unless the Legislature has elsewhere denied it this power, it would clearly operate to give the commission the power to fix rates of fare for bus lines in New York City.

The City of New York has received from the Constitution and the Legislature powers over the regulation of its streets and the granting of franchises. Section 73 of the former Greater New York Charter (L. 1901, ch. 466) provided, as the successor statute now provides (New York City Charter [1938], § 367, subd. a), that in giving franchises, the grant shall contain a provision securing efficient public service " at reasonable rates ", the security to be, among other things, a right of forfeiture of the franchise. Section 74 of the same act authorized the Board of Estimate and Apportionment to embody the results of its investigation of franchise values into a contract including " rates, fares and charges." (Now New York City Charter [1938], § 369.) The power given by these statutes is

primarily designed to protect the city in the use of its streets and the fares to be provided are incidental.

Read side by side with the general delegation of the fare-making power of the State to the Public Service Commission, these powers, mere incidents of franchise agreements, must be construed as yielding, in the legislative intent, to the general power where the State occupies the disputed area of regulation. Indeed, the exercise of such powers incidental to the granting of franchises, must be made with the general statute, if one exists, in mind. (*People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356, *supra.*)

The present statute giving power to the Public Service Commission existed when all of these franchise agreements were made. Even if there were then no general statute, the Legislature no doubt could supersede such a local arrangement as to rates, for the holding of the court both in *Matter of Quinby* v. *Public Service Comm.* (223 N. Y. 244) and in *City of New York* v. *Interborough R. T. Co.* (257 N. Y. 20) was that the Legislature had not, not that it could not, superseded such a local arrangement. See especially the interpretation of the *Quinby* decision (*supra*, p. 264) by CRANE, J., in his brief memorandum of concurrence.

The parties acting under the charter provisions, these petitioners and the City of New York, themselves, seem to have construed the franchise provisions on fares as subject to revision by a State rate-making authority. The contracts provided for cancelation of the franchises if the fare were increased by public authority without the consent of the city, and an intent to prevent the exercise of lawful regulatory power by virtue of the contracts is expressly disavowed.

A further point requires discussion. Some of the petitioners are successors to streetcar companies which served similar routes. Rates of fare were fixed by franchise agreement between the city and these streetcar companies before the occupation of the field of regulation by the State in 1907 (Public Service Commissions Law; L. 1907, ch. 429). The need for consent of a city to such a use of its streets was, by the amendment of 1875, protected by the Constitution. It was thought by Judge POUND in writing the *Quinby* decision (223 N. Y. 244, 263, *supra*) that the constitutional nature of this needed consent might make it more imperative that, if the Legislature was to allow a State agency to revise a rate made as part of a franchise consent, it should say so quite explicitly.

Later Judge CARDOZO, in the *Nixon* case (229 N. Y. 356, *supra*), saw the possibility that franchises agreed to after enactment of a general regulatory statute might be so related to franchises made before the statute as to fall within the doctrine expressed in the *Quinby* case (*supra*), and in the *Interborough Rapid Transit* case (257 N. Y. 20, *supra*) such a close relationship was found in the subway agreements. But what must not be lost sight of in the discussion is that there is no case which holds the Legislature cannot fix a rate different from that provided by a franchise agreement if it shows its intent to do so plainly, and that the effect of this regulation on franchises made before 1907 was excluded only because of an interpretation of legislative intent.

It would carry an argument, tenuous enough in the first place, to absurd lengths to say that because the Legislature had not said before 1907 it would deal with rates of trolley fares fixed in local franchises, successors to trolley companies, or even the companies themselves, making new franchise agreements for a different kind of use of streets by a different means of transit, with a regulatory statute applicable in terms before them when they wrote their contract, would deem themselves free from later exercise of the legislative rate-making power.

For these reasons I find that the Public Service Commission has the power to direct a reduction of the rates of fare and to conduct the necessary investigation upon which to base such a determination. A decision and final order in favor of the respondents on the merits may be submitted in the Queens-Nassau proceeding, and orders dismissing the petition in each of the other proceedings on the motion of the respondents. All orders are without costs. The pleadings and exhibits should be obtained at this office by the respective parties.