RAILWAY STEEL SPRING CO. v. CHICAGO & E. I. R. CO.

(District Court, N. D. Illinois. November 1, 1919.)

No. 57.

1. CONSTITUTIONAL LAW ⊜54—EMINENT DOMAIN ⊜70—POWER TO DETERMINE JUST COMPENSATION FOR PROPERTY TAKEN NOT LEGISLATIVE.

The ultimate determination of the amount of compensation which an owner shall receive for the use of his property, taken from him by the government for the public benefit, is a judicial function, and Congress has no power to fix such compensation, nor the rules by which it shall be measured.

2. RAILROADS ⊜5½, New, vol. 6A Key-No. Series—INADEQUATE COMPENSATION FOR USE UNDER FEDERAL CONTROL.

The amount of annual compensation offered by the Director General of Railroads for the use of a railroad then in the hands of a receiver, while under federal control, held inadequate, and the receiver instructed to decline the offer and to proceed under Federal Control Act, § 3 (Comp. St. 1918, § 3115¾c), to have the amount of just compensation determined.

In Equity. Suit by the Railway Steel Spring Company against the Chicago & Eastern Illinois Railroad Company. On petition by receiver for instructions.

See, also, 246 Fed. 338.

Will H. Lyford, of Chicago, Ill., for receiver.

Arthur H. Van Brunt, of New York City, and Howard M. Carter, of Chicago, Ill., for Central Trust Co. of New York.

Roberts Walker, of New York City, and Mitchell D. Follansbee and M. C. Bragdon, Jr., both of Chicago, Ill., for Bankers' Trust Co.

Donald F. McPherson (representing Cutting, Moore & Sidley), of Chicago, Ill., for Equitable Trust Co. of New York.

Edward H. Blanc, of New York City, and F. B. Johnstone, of Chicago, Ill., for Farmers' Loan & Trust Co.

Brode Davis, of Chicago, Ill., for Metropolitan Trust Co. of City of New York.

S. O. Levinson, of Chicago, Ill., for stockholders' committee.

CARPENTER, District Judge. Upon reading and filing the petition of Thomas D. Heed, receiver, heretofore appointed and now acting in the above-entitled cause, for instructions as to further procedure to secure just compensation for the use of Chicago & Eastern Illinois Railroad under federal control, and the report of negotiations on behalf of said receiver with the Director General of Railroads, relating to such compensation; upon motion of counsel for the receiver, and it appearing that counsel representing all parties to this proceeding had due notice of the hearing on said petition, and that the general counsel

to the Director General of Railroads also had notice of this hearing and declined to appear; and the court having taken proofs of the facts and circumstances set forth in said petition and in said report, and being now satisfied that the prayer of said petition ought to be granted, and that it is a proper exercise of the court's discretion and power in the premises to enter an order herein, adjudging whether or not $3,280,-000.88, the amount of annual compensation offered by the Director General to the receiver, would constitute just compensation for the possession, use, and operation of the Chicago & Eastern Illinois Railroad during federal control, and to direct the receiver to accept such amount of compensation and proceed with the negotiation of a contract with the Director General of Railroads based upon such compensation, or to reject such amount of compensation and to proceed in accordance with the third section of the Federal Control Act (Act March 21, 1918, c. 25, 40 Stat. 454 [Comp. St. 1918, § 3115¾c]), and the court having heard arguments of counsel for the receiver and of counsel for the stockholders and for the trustees under each of the mortgages which have been foreclosed in this cause, and for the bond-holders' committees which represent the majority in amount of the bonds secured by such mortgages, to the effect that the said amount of compensation is inadequate and unjust, and should not be accepted by the receiver; and due deliberation being had, the court finds the following facts and conclusions of law:

The Chicago & Eastern Illinois Railroad, comprising sundry railroad lines in the states of Illinois and Indiana, on the 28th day of December, 1917, was in the possession and custody of this court, through its receiver, William J. Jackson. On said date, the President of the United States, acting through the Secretary of War and under the authority conferred upon him by the act of Congress approved August 29, 1916, took possession and assumed control of said railroad, together with other railroads, under a formal proclamation, in which the President declared that it had then—

"become necessary in the national defense to take possession and assume control of certain systems of transportation and to utilize the same, to the exclusion as far as may be necessary of other than war traffic thereon, for the transportation of troops, war material and equipment therefor, and for other needful and desirable purposes connected with the prosecution of the war."

It was further stated in such proclamation that, for the purposes of accounting, such possession and control should date from 12 o'clock midnight on December 31, 1917.

By the first paragraph of section 1 of an act of Congress, approved March 21, 1918, called the Federal Control Act (Comp. St. 1918, § 3115¾a), the President was authorized to agree with and to guarantee to any carrier making operating returns to the Interstate Commerce Commission that, during the period of such federal control, it should receive as just compensation an annual sum, payable from time to time in reasonable installments, for each year and pro rata for any fractional year of such federal control, not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June 30, 1917.

The sixth paragraph of section 1 of the Federal Control Act was as follows:

"If the President shall find that the condition of any carrier was during all or a substantial portion of the period of three years ended June thirtieth, nineteen hundred and seventeen, because of nonoperation, receivership, or where recent expenditures for additions or improvements or equipment were not fully reflected in the operating railway income of said three years or a substantial portion thereof, or because of any undeveloped or abnormal conditions, so exceptional as to make the basis of earnings hereinabove provided for plainly inequitable as a fair measure of just compensation, then the President may make with the carrier such agreement for such amount as just compensation as under the circumstances of the particular case he shall find just."

By an order entered in this cause April 27, 1918, the receiver's counsel was directed to negotiate, with the President of the United States or his duly authorized representative, an agreement for the maintenance and upkeep of said railroad during the period of federal control, for the determination of the rights and obligations of all parties to the agreement, arising from or out of federal control, including the compensation to be received or guaranteed, as in said federal act more fully provided. In such order counsel was directed, from time to time to make report of the result of such negotiations, and it was also ordered that no such agreement should be made or should become effective until it should have been approved by the court, on hearing, after notice to counsel for all parties to the record in this cause, and to the general counsel to the Director General of Railroads.

Pursuant to said order of the court, a report of negotiations with the Director General and his representatives was filed herein October 17, 1919, together with a petition by the receiver for instructions as to further procedure to secure just compensation for the use of said railroad while under federal control. On said last-mentioned date a hearing was had on such petition and report.

This railroad property was placed in the custody of this court to be operated and especially conserved for those most entitled to it, the security holders, the stockholders, and the creditors. It is the duty of the court to determine whether that has been done and would be done by accepting the Director General's offer of $3,280,000.88, as annual compensation for the possession, use, and operation of the said railroad during the period of federal control. The court must determine whether such amount constitutes just compensation, and, if it determines that the receiver ought to have compensation in a greater amount than is so offered, the court cannot, in good conscience, authorize him to accept the amount offered.

[1] The ultimate determination of the amount of compensation which an owner shall receive for the use of his property, taken from him by the government for the public benefit, is a judicial function. While Congress has the power to determine what property shall be taken for the public use, it has no power to fix rules by which the amount of compensation to be paid for such use shall be determined. In Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463, the Supreme Court discussed an act of Congress (Act Aug. 11, 1888, c. 860, 25 Stat. 400) authorizing the Sec-

retary of War to purchase a lock and dam. The act provided, in the event of inability to make voluntary purchase, the lock and dam should be condemned, provided "that in estimating the sum to be paid by the United States, the franchise of said corporation to collect tolls should not be considered or estimated." The Supreme Court, at page 327 of 148 U. S., at page 626 of 13 Sup. Ct. (37 L. Ed. 463), said:

"By this legislation, Congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The Legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but, when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the Legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry. * * *

"We are not, therefore, concluded by the declaration in the act that the franchise to collect tolls is not to be considered in estimating the sum to be paid for the property." 148 U. S. 328, 13 Sup. Ct. 627, 37 L. Ed. 463.

[2] The Director General having offered to the receiver compensation in excess of the so-called standard return, the court must assume that the Director General has found the condition of the defendant's railroad to be so exceptional as to make the standard return plainly inequitable as a fair measure of just compensation, and under the sixth paragraph of the first section of the Federal Control Act, the Director General was fully authorized to agree to pay to the receiver such amount as, under all the circumstances of this case, he should find just.

It was further provided, under the third section of the act, that, failing an agreement with the Director General as to the amount of compensation, the carrier or the government might have the amount of compensation determined by a board of referees, and the Director General was authorized to make an agreement with the carrier for compensation, not exceeding the amount determined by such board of referees. Failing an agreement upon an amount of compensation so determined, the third section authorized the determination of the amount thereof by the Court of Claims.

The decision of this court on the receiver's petition, and the decision of a board of referees or the Court of Claims, if called upon to act, pursuant to the third section of the Federal Control Act, must be based upon the established principles of law and equity which have been laid down by the courts for the determination of just compensation, and cannot be controlled by the measure of compensation recommended by the President and authorized by Congress in the first paragraph of the Federal Control Act.

The railroad property which constituted the Chicago & Eastern Illinois Railroad at the time it was taken over by the Director General of Railroads, December 31, 1917, had had an unbroken record of financial success for 25 years prior to the year 1913, when the receivers were appointed, and during all that time it earned all of its operating expenses, fixed charges, and taxes, and a dividend of 6 per cent. on its

preferred stock, and during the last 10 years of that period dividends at the average annual rate of 7.15 per cent. on its common stock. During the year ended June 30, 1913, in which the receivers were appointed, the traffic of the road increased to such an extent that its operating revenues were more than a million dollars in excess of those of any previous year and exceeded the economical carrying capacity of the railroad. Such receivership was not caused by the insolvency of the defendant railroad company, but was caused by the insolvency of another railroad company which owned the stock of the defendant company.

Under the orders of this court, the receivers entered upon a program of reconstruction and improvement of the defendant's railroad, and, during the years of 1913 to 1917, inclusive, the aggregate sum of $31,020,878 was expended upon said railroad and charged to maintenance, as compared with $18,456,175, the aggregate charges to maintenance of the same lines of railroad during the preceding period of 5 years, and $8,229,944 was expended and charged to additions and betterments.

The result of these higher expenditures for maintenance and of the additions and betterments which have been placed upon the property during the same period has been to enable this road to carry 10,488,274 tons of coal in 1917 and 11,394,967 tons of coal in 1918, whereas its capacity was strained in 1913 to carry 7,548,321 tons of coal. The increased expenditures for maintenance of equipment during the receivership are also conclusively shown to have enabled the receivers to gain 3,027 good-order cars since the beginning of the test period, and to increase the credit balance for equipment rents for the use of this road's equipment on other railroads from $254,028, the average annual amount thereof during the seven years preceding the test period, to $1,080,957 for the calendar year 1917.

Notwithstanding these facts, which it appears have been made known to the Director General, the effect of his award of compensation is that, at the end of 4½ years of receivership, the value of the use of this property per year to its owners is less by $1,955,042 than its average net value to its owners during the 7 years next preceding the year in which the receivers were appointed, and that the annual compensation to the receiver during federal control should be $1,128,029 less than the actual railway operating income of the property during the calendar year 1917.

"The rule for the measure of damages for the temporary occupation of lands by the government is the value of such temporary occupancy at the time of entry, as though the claimant had leased and the government had rented the premises, regard being paid to the nature of the occupancy and to the fact that the government has the option of discontinuing the implied tenancy on any day or of continuing it indefinitely." Johnson v. United States, 2 Ct. Cl. 391.

At the time the government took possession of this railroad, it had a greater carrying capacity than ever before. The number of its freight cars which were in good order was greater than at any previous time during the receivership. It was about to receive seven large Santa

Fé type locomotives, for use upon its Illinois Division, which was then, for the first time, in condition for the operation of such large engines. The United States was engaged in a great foreign war, and the industrial demand for the carriage of coal and other freight and for the carriage of passengers was greater than ever before, and there was no prospect of an early termination of the war. The government soon thereafter purchased for this railroad 20 additional large locomotives and 1,000 additional freight cars, and, on the earnest protest of the receiver against such purchase of cars, was only willing to reduce the number purchased to 500 cars. The only reasonable ground for the purchase of such additional equipment must have been that the Director General contemplated the movement over this railroad of a substantially greater amount of traffic than was carried by the road during the year 1917. It would be unconscionable to impose upon the owners of this property the cost of this additional equipment, at high war-time prices, and still fix the receiver's compensation upon the basis of a less amount of traffic than the road had carried during the previous year, with a less average amount of equipment in good order than the road had in service at the time the government took possession.

"For each separate use of one's property by others, the owner is entitled to a reasonable compensation; and the number and amount of such uses determine the productiveness and the earnings of the property, and, therefore, largely its value." Monongahela Navigation Co. v. United States, 148 U. S. 312, 328, 13 Sup. Ct. 622, 627, 37 L. Ed. 463.

"The question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken." 148 U. S. 343, 13 Sup. Ct. 633, 37 L. Ed. 463.

The just compensation to which the receiver is entitled in this case should be measured by the earning capacity of this property on the 31st day of December, 1917, and such earning capacity should be determined by the application of the freight and passenger rates which were then in force or authorized and approved by the Interstate Commerce Commission and the state commissions of Illinois and Indiana, to the volume of business which this railroad could reasonably be expected to have carried during the period of federal control, if the railroad had remained in the control of the receiver or the defendant company.

The railway operating income of this property during the calendar year 1917 amounted to $4,408,030, and as the record clearly shows that the rates for the carriage of traffic on this railroad were materially higher at the close of the year 1917 than they were during the first 10 months of that year or during the test period, the conclusion is irresistible that the value of the use of the railroad was higher at the close of the year 1917 than at any previous time. The investment in road and equipment on this property, as shown by the receiver's books as of the 31st day of December, 1917, was $81,756,217, and the owners of this railroad were entitled to a reasonable return upon such amount of investment during the period of federal control.

As of the 31st day of December, 1917, after deducting the miscellaneous earnings, the annual fixed charges accruing against this property and the annual expenses of the receiver in its administration,

which were not assumed by the Director General of Railroads, aggregated $3,771,844.21, and the amount of just compensation to which the receiver was entitled should have included that amount, and, in addition thereto, a sum equal to a reasonable dividend upon $19,367,-500 of outstanding capital stock of the defendant company. To such total amount should be added interest at reasonable rates upon all additions and betterments to road and equipment placed upon or charged to this property by the Director General during federal control.

This is not the ordinary and usual case of a railroad in receivership, which was not making any money and had to be operated under the jurisdiction of the court in order to perform its public functions. It is a unique case, in that this receivership was made necessary by the insolvency of a large railroad system of which this successful railroad was a part, and the controlling purpose of the operations of the receivers has been to separate this property from the larger system, and to enlarge and improve its facilities and capacity, in order that it might better serve the territory through which its lines passed and produce larger income and greater profits for its owners. The court finds that such purpose had been accomplished at the time when the Executive Department of the government assumed possession and control of this property, and that the compensation to which the owners of the property are entitled for its use during the period of such federal control should be measured by the value of the use of the property on December 31, 1917, and not by the net financial results of its abnormal operations during the so-called test period of 3 years ended June 30, 1917, during which the property was being rebuilt, improved, and enlarged by the devotion of its income to those purposes, rather than by accruing net earnings to be devoted to the normal purpose of paying interest and dividends.

It is therefore ordered, adjudged, and decreed by the court:

1. That the amount of $3,280,000.88, offered by the Director General of Railroads to the receiver herein, as annual compensation for the possession, use, and operation of the Chicago & Eastern Illinois Railroad during the period of federal control, is inadequate, and would not constitute just compensation.

2. That the receiver is instructed to decline said amount of compensation offered by the Director General of Railroads, and to proceed forthwith, under the third section of the Federal Control Act, to secure the determination of the amount of just compensation by a board of referees, to be appointed by the Interstate Commerce Commission, and to report to this court the amount of such compensation so determined.

3. It is further ordered that the receiver is authorized to employ such other counsel, accountants, and other assistants as he may deem necessary, to assist the general counsel in presenting this matter to such board of referees.