In the Matter of the Application of the NEW YORK EDISON COMPANY and Others, Petitioners, for a Certiorari Order against MILO R. MALTBIE and Others, Constituting the Public Service Commission of the State of New York and Another, Respondents. THE CITY OF NEW YORK, Intervenor.

Third Department, May 8, 1935.

*Shearman & Sterling* [*Richard Joyce Smith, William L. Ransom, Neile F. Towner* and *Jacob H. Goetz* of counsel], for the petitioners.

*Charles G. Blakeslee* [*John T. Ryan* of counsel], for the respondents.

*Paul Windels* [*Joseph L. Weiner, Harry Hertzoff* and *Arthur A. Segall* of counsel], for the intervenor.

HILL, P. J. Under certiorari we are reviewing the orders of the Public Service Commission fixing what is described as " temporary emergency rates " for electrical energy sold in the city of New York. Orders made on August 18, 1933, affected both New York city and Westchester county. The Westchester Lighting Company operates in the upper part of the city of New York and Westchester county. It was required to decrease rates by not less than three per cent in each area. The other four petitioners were required to decrease rates by not less than six per cent. Orders

made on November twenty-third, after a rehearing, eliminated Westchester county and required the Westchester Lighting Company to reduce its rates in the city of New York also by not less than six per cent, and the August orders were confirmed as to the other companies. The new rates were to become effective not later than September 1, 1933, and to continue for one year. The Albany County Special Term (150 Misc. 200) enjoined the enforcement of the orders, but required the petitioners to impound money equal to the amount of the reductions directed, this to be refunded to the consumers in the event the orders of the Commission should be sustained. The restraining order remained in force during the entire year, and there is now impounded $8,805,556, the ownership of which is to be determined. The Commission did not extend the period for the " temporary emergency rates " beyond September 1, 1934, and after that date the petitioners were permitted to charge the rates as before September 1, 1933, without impounding further moneys. The " temporary emergency rate " hearings were conducted by the Commission as separate proceedings and not incidental to the establishment of permanent rates. At the beginning of the hearings on May 26, 1933, the Chairman of the Commission read a statement as to the necessity and purposes of the hearings and announced the rules of law that would apply, under the emergency which the Commission found to exist. It was recited that over one hundred and twenty rate cases were pending in New York State, a greater number than had ever been known, that " no one should be blind to the fact that there is general dissatisfaction with existing utility rates. There is belief that the utilities have not borne their fair burden of the depression, and that they are not now contributing their fair share towards economic recovery." The inability of the Commission finally to dispose of the pending permanent rate cases within a reasonable time was stated, and that it was necessary to adopt new and what was described as practical means for handling rate complaints promptly. It was further stated, " it is not contemplated in the establishment of such rates that a valuation of the property as required by the courts for the final determination will be made," and the utility companies were invited " to assist in escaping from the present depression, unequalled in the history of this country," to the extent of curtailing dividends and using up surplus earnings, if necessary, and finally they were admonished " whatever may be the policy on which the companies decide, they must answer not alone to this Commission but to public opinion." The companies in reply promised to " cooperate within the bounds of sanity and reason." In making the August orders,

the Commission observed some of the rules laid down by the courts. They fixed the capital of the petitioners as shown upon their books and as reported to the Commission. This did not include working capital or going value. Nothing was added for going value, but for working capital there was added one-tenth of the operating expenses of the companies for the calendar year of 1932. From this total was deducted the amount of the companies' " retirement reserves " (a reserve somewhat analogous to that for accrued depreciation) and the amounts shown to have been contributed by consumers for extensions, and it was determined that for the year during which the rates were to be in force, the expenses, receipts and earnings would be the same as during the calendar year 1932, with a few minor adjustments to reflect reductions in some of the rates of two of the smaller companies. Upon such assumptions, a return of six per cent was shown on the rate base arrived at as above indicated, after the prevailing rates had been reduced as required by the August orders.

The petitioners offered in evidence proof concerning the present value of the property used in the public service, the going value and the necessary amount of working capital. It was all excluded except that as to working capital. The Chairman of the Commission stated: " It is obvious that if this testimony were received at this time, it would lead into every phase of valuation and rate making and there would be no temporary rates." In the application for a rehearing, the petitioners assigned error as to the above items, and complained that they had not been permitted to introduce evidence showing a very substantial increase in operating expenses over 1932 caused by lessening the hours of labor and increasing the scale of wages as required by the National Industrial Recovery Administration and the payment of nearly $4,000,000 of additional taxes under new Federal statutes and $1,250,000 under new local tax laws of the city of New York. This evidence was rejected on the original hearings because the companies had not adopted the codes and signed the agreement to operate their business under the rules of the NIRA.

After the August orders were made, the companies adopted the codes and signed the agreements under the NIRA, and then petitioned for a new hearing. This was granted but the scope limited to " the definite effects upon said corporations of the agreements and/or codes entered into by said corporations under the National Industrial Recovery Act, and with respect to other definite effects of the National Industrial Recovery Act upon said corporations, since the close of the hearing herein on August 9, 1933; " and in all other respects the petitions were denied. Upon the

rehearing the companies presented proof indicating a net increase of about $12,000,000 in operating expenses for the year involved over those of the calendar year 1932. The Commission recognized and found that the operating expenses would be increased by slightly over $7,700,000. The claim of increased cost for additional employees was reduced by over $2,000,000. The New York city local taxes were allowed, but only one-half of the Federal three per cent energy tax and the Federal capital stock tax, the amount disallowed of taxes being about $2,000,000. The majority opinion states the reason for disallowing the Federal taxes: " The law [three per cent Federal tax on electric sales] was changed by the last Congress in order to transfer the tax from consumers to the companies — to the stockholders. The discussions in the Congress show clearly the purpose of the change, and the utilities opposed the law because they recognized that its purpose was to shift the tax from consumers to stockholders. * * * If the Commission were now to recognize the claim made by the companies in this case and consider this three per cent tax as a part of the cost of service to be paid for by consumers in fixing either temporary or final rates, the change in the law made by the Congress would be nullified and the tax would again be imposed upon consumers. The practical effect of such action, so far as the public is concerned, would be the same as if the Congress had not transferred the tax from consumers to stockholders. In my opinion, this tax should not be treated as an operating expense." When the Commission increased the estimated operating expenses nearly $8,000,000, the net earnings did not show a reasonable return upon the rate base adopted at the August hearings. This necessitated that it be reduced. The formula used in the reduction was to give " equal weight to two factors," one the amount of the return computed at six per cent which the 1932 net income would produce on the rate base as fixed by the Commission in August, the other the amount of the return computed at six per cent which the 1932 net income would produce on the stated value of the common stock of the companies. (The total of the common stock as figured by the Commission was $506,000,000; the remainder of the total capitalization of $830,000,000 consisted of funded debts.) To reduce this formula to the terms of a rate base, the Commission gave " equal weight to two factors," one the $829,000,000 August rate base, the other the stated value of the common stock fixed at $506,000,000, and the new rate base was found by adding together one-half of each of these amounts. The result was a so-called rate base of about $667,000,000. If it were permissible to use such a formula in fixing a rate base, the arithmeticians of the Commission

erred many millions of dollars in fixing the true amount of the capital stock by disregarding inter-stock ownership among the petitioners. All except thirty shares of the $48,000,000 of common stock of the United Electric and Power Company is owned by the New York Edison Company, and the stock of the latter is in part founded upon its ownership of the stock of the former; also the United Company paid more than $7,000,000 as dividends on this stock to the New York Edison Company, and this provided in part the fund from which dividends were declared by the latter company. The reduction in the amount of the return, while the rate ostensibly was kept at six per cent, by this somewhat unique method, was justified upon the argument of this appeal upon the ground that the Commission had been too generous with the petitioners in the August orders. Further, that about $100,000,000 of the fixed capital, according to the books of the companies and the reports to the Commission, had not been classified according to the uniform system of accounts which the Commission requires the companies to keep. The unclassified property, stated to be eleven and seven-tenths per cent of the aggregate, is discussed in the majority opinion, " In general, these items represent amounts introduced into the capital structure prior to the creation of the Public Service Commission and the system of accounts established in 1908. * * * No attempt has yet been made in this proceeding to determine the extent to which the figures [non-classified property] represent actual property, but it should be noted that the base upon which the rate of return is computed includes these amounts which have been challenged, and they are material amounts." The suspicion that an account set up more than a quarter of a century ago should then have contained fictitious items amounting to a large percentage of the total, is entitled to no serious consideration by a court in fixing the value of petitioners' property. The fixed capital accounts of these companies have increased markedly in twenty-five years, and if more than one-tenth of the items are now fictitious, and the fiction came into being at the beginning, it was then a much larger percentage of the whole. The members of the first Public Service Commission, who had charge of setting up the first fixed capital accounts of these companies in 1907 or 1908, were honest and able men, as a perusal of the list of the then members will show, and the perpetration of a gigantic fraud upon the public would have been impossible of accomplishment, even assuming a desire on the part of the companies.

The orders under review establish what the majority of the Commission designate as " temporary emergency rates." In recent

legislative and judicial parlance the use of the word " emergency " indicates a temporary and supposedly necessary abrogation of non-emergency constitutional rights. The word is used in that sense in connection with these rates as is indicated by many statements in the majority opinion. A recital of one will be sufficient. " This is the very time when surplus earnings so created ought to be used for the benefit of the public. They do not belong in equity solely to the companies. If the law is to be construed so as to prevent the Commission from requiring reductions in rates under the conditions now existing, it is time that the public be made aware of the fact and the law recast." This announcement indicates a motive to be generous toward needy rate payers with the money and property belonging to the utility companies. Some may regard this as desirable and the motive as praiseworthy, but " the point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute." (*Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 420; 55 S. Ct. 241, 248.)

The application of the emergency doctrine as it is now applied had its modern revival if not its origin in the September rent cases. (*People ex rel. Durham R. Corp.* v. *La Fetra*, 230 N. Y. 429; error dismissed, *sub nom. People ex rel. Brixton Operating Corp.* v. *La Fetra*, 257 U. S. 665.) Quoting from the opinion in the Court of Appeals, " Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war, * * * earthquake, pestilence, famine and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos, demand the enactment of laws that would be thought arbitrary under normal conditions " (p. 444). Emergencies may be declared to exist by the Legislature but not by its delegate. " Whether or not a public emergency existed was a question of fact, debated and debatable, which addressed itself primarily to the Legislature. That it existed; promised not to be presently self-curative, and called for action, appeared from public documents and from common knowledge and observation. If the law-making power on such evidence has determined the existence of the emergency and has, in the main, dealt with it in a manner permitted by the constitutional limitations upon legislative power, * * * the legislation should be upheld " (p. 440). The Legislature has not declared that an emergency exists in the electric utility field, and the Commission may not confiscate past earnings and accumulations of petitioners. The law under which the Commission acted (Public Service Law, § 72) empowered it to " authorize an immediate, reasonable, temporary increase or decrease in such price [for electric service] pending a final determination of the price to be thereafter

charged by such person or corporation." It authorized the Commission to consider all facts which in its judgment had any bearing upon a proper determination of the question and to fix rates " with due regard among other things to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies." The Legislature did not attempt to delegate legislative powers to the Commission. Had such an attempt been made, doubtless it would have been unconstitutional, as the Legislature may not delegate its law-making power to boards, bureaus or commissions. It may authorize the adoption of rules and the establishment of regulations for the administering of the laws which it had enacted. (*Panama Refining Co.* v. *Ryan, supra; United States* v. *Grimaud,* 220 U. S. 506; *Wayman* v. *Southard,* 10 Wheat. 1; *People* v. *Klinck Packing Co.,* 214 N. Y. 121.) The rule and regulations which the Commission may make or establish must be within the limits of the legislative grant. (*Brown* v. *University of State of New York,* 242 App. Div. 85; affd., 266 N. Y. 598.) The attempt by the Commission to apply the emergency doctrine was *ultra vires.*

The Commission was empowered to fix temporary rates " pending a final determination " as to permanent rates. It was stated at the beginning of these hearings that they were to be conducted in a practical way so as to deal promptly with rate complaints " in this extreme emergency." At the conclusion of the hearings in August, the majority opinion states, " We come now to consider what reductions should reasonably be made and how long they should continue. Possibly the last point should be considered first. It is impossible for any one to predict how rapidly conditions will improve. * * * All hope that a genuine and lasting recovery is at hand. However, at the end of one year, conditions may have so changed that an order issued now will be unjust either to the public on the one hand or the company on the other. I suggest, therefore, that the order be limited to one year from September first." The suggestion was adopted in the order then made. Obviously these temporary rates were not fixed " pending a final determination " of a permanent rate proceeding, but were adopted pending the final termination of the national and worldwide depression. However, were the rates in effect temporary rates of the kind that the Legislature authorized the Commission to make, they would still be final legislative acts " as to the period during which they should remain in effect pending the final determination; and if the rates prescribed were confiscatory, the company would be deprived of a reasonable return upon its property during such period." (*Prendergast* v. *New York Telephone Co.,*

262 U. S. 43, 49.) Even the Legislature may not confiscate petitioners' property for a year or two years or during any period, and much less the Public Service Commission without legislative power. The constitutional inhibition as to confiscation applies to temporary as well as to permanent rates.

Petitioners, not the public, own these electric properties, and this review, like all similar ones, presents the question whether the rates provide a fair return for the use of the property. All relevant facts may be considered in determining value, but consideration is to be given facts, not formulas. Among the facts which the courts have held to be proper subjects for consideration is the actual cost of the property — the investment the owners have made. Likewise the cost of reproduction as of the time when the rates will be in force, giving due regard to depreciation and obsolescence. The fact-finding body is to determine the relative weight to be given actual cost, historical cost and reproduction cost under the facts and circumstances which are proven to exist. The result, however, must be rates that will pay to the owners a fair return upon the reasonable value of the property at the time it is being used for the public. (*Smyth* v. *Ames*, 169 U. S. 466; *Minnesota Rate Cases*, 230 id. 352, 434; *McCardle* v. *Indianapolis Water Co.*, 272 id. 400, 411; *St. Louis & O'Fallon R. Co.* v. *United States*, 279 id. 461, 484, 485; *Los Angeles Gas Corp.* v. *Railroad Commission*, 289 id. 287.) " The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations. And mindful of its distinctive function in the enforcement of constitutional rights, the court has refused to be bound by any artificial rule or formula which changed conditions might upset. We have said that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory ' is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.' " (*Los Angeles Gas Corp.* v. *Railroad Commission, supra*, p. 305.) This is far from saying that the correctness of the conclusion reached after considering facts may not be checked as to its accuracy by the experiences of the past, including earnings, dividends, increase of surplus and other revealing data, but formulas, derived from past earnings, dividends and the increase of surplus may not be a determining factor in fixing the value of the property which belongs to a private person or corporation. " Profits of the past cannot be used to sustain confiscatory rates for the future." (*Board of Public Utility Commissioners* v. *New York Telephone Co.*, 271 U. S. 23, 32.)

The Commission refused to consider or include going value in connection with the rate base, or to permit the petitioners to introduce proof upon the subject. " 'There is an element of value in an assembled and established plant doing business and earning money, over one not thus advanced.'" This element and investment is a property right which belongs to these petitioners and they had a right to have it considered in determining the value of the property upon which they were entitled to a return. (*Los Angeles Gas Corp.* v. *Railroad Commission, supra; Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153; *Denver* v. *Denver Union Water Co.,* 246 id. 178, 191, 192; *People ex rel. Kings County Lighting Co.* v. *Willcox,* 210 N. Y. 479.) Going value must be included in every rate base: it is not important that the margin above present physical value should be described as going value, but the aggregate figures must be large enough so that the court is able to see that going value is included. " The fact that this margin in the rate base was not described as going value is unimportant, if the rate base was in fact large enough to embrace that element." (*Los Angeles Gas Corp. Case, supra,* p. 317.) As a matter of argument, it has been suggested that depreciation should be offset against going value. (Harvard Law Review, vol. XLVII, p. 721.)

One-half of the new Federal taxes was allowed as an operating expense, the other half charged to the stockholders. The entire amount should have been included in operating expenses. " In calculating whether the [rate] will yield a proper return, it is necessary to deduct from gross revenue the expenses and charges; and all taxes which would be payable if a fair return were earned are appropriate deductions. There is no difference in this respect between State and Federal taxes or between income taxes and others. But the fact that it is the Federal corporate income tax for which deduction is made, must be taken into consideration in determining what rate of return shall be deemed fair." (*Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 399.)

The burden of proof was upon the petitioners in these proceedings. The evidence which they offered as to the physical and going value of their plants should not have been excluded. It was admissible, and the Commission should have received and considered it.

The Commission has determined that six per cent is a reasonable average return upon petitioners' property. This is neither approved nor disapproved. However, mention must be made of the Commission's construction of the words " reasonable *average* return." Quoting from the majority opinion, " The law refers to a ' reasonable *average* return.' There is no requirement that the return in

every month, or even every year, shall be reasonable. It must be reasonable over a period of time; otherwise the word ' average ' would have no meaning." The language of the statute does not empower the Commission to " average " the returns of past years with present. As used in this section " average " means conformity to prevailing standards, a middle point between two extremes, not the highest rate of return nor yet the lowest, but a return that is in keeping with the common run of returns of the period involved. An adequate and non-confiscatory return has been described. " A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties." (*Bluefield Co.* v. *Public Service Commission*, 262 U. S. 679, 692; *Smith* v. *Illinois Bell Telephone Co.*, 282 id. 133, 160.)

*Lindheimer* v. *Illinois Bell Telephone Co.* (292 U. S. 151) was a suit brought in the United States court in 1923 to restrain the enforcement of rates established during that year by the Illinois Commerce Commission. The final hearings in the suit were had in 1933. The actual experiences of the telephone company as to operating revenues and expenses, net income, dividends and accretions of capital and surplus for all the years between the making of the rate order and the trial of the case were before the court on the appeal. Concerning the wide difference between the estimates and calculations of the experts and the actual experience of the company, the court said (p. 164): " Elaborate calculations which are at war with realities are of no avail. The glaring incongruity between the effect of the findings below, as to the amounts of return that must be available in order to avoid confiscation, and the actual results of the company's business makes it impossible to accept those findings as a basis of decision." By the terms of the orders under review in this matter, the period during which the rates were to apply has passed. The final determination as to the legality of the rates set up will have no effect upon either the current prices paid by consumers or those which have been paid since September 1, 1934. It will, however, determine the ownership of more than $8,000,000 impounded under the restraining order. If the rates as fixed for the year beginning September 1, 1933, are finally determined to be confiscatory, the money will belong to the companies, if sustained it will belong to the consumers. As in the *Lindheimer* case, time has now elapsed so realities may replace conjectures and estimates, or at least may be used to check conjectures and estimates.

The many prejudicial errors in this proceeding make necessary a new hearing. This court is without power to determine disputed questions of fact in proceedings of this kind, but it may annul a determination and order and remit the matter to the Public Service Commission for a new and further hearing on the merits. (Civ. Prac. Act, § 1305; *People ex rel. Town of Hempstead* v. *Tax Commissioners*, 214 N. Y. 594.) This should be done and upon the new hearing the Public Service Commission in fixing the rate base and in passing · upon the propriety of items to be included in operating expenses, and in all regards, should follow the settled law often before and here stated and repeated.

The determination of the Public Service Commission should be annulled and matter remitted to the Commission for a new and further hearing on the merits, with fifty dollars costs and disbursements payable to the petitioners.

RHODES, McNAMEE, CRAPSER and HEFFERNAN, JJ., concur.

Determination of the Public Service Commission annulled and matter remitted to the Commission for a new and further hearing on the merits, with fifty dollars costs and disbursements payable to the petitioners.