18 N.Y.2d 212 (1966)
In the Matter of the City of New York, Respondent-Appellant, Relative to Acquiring Title to Property in the Boroughs of Manhattan and Queens. Fifth Avenue Coach Lines, Inc., et al., Appellants-Respondents. (Consolidated Proceedings.)
Court of Appeals of the State of New York.
Argued February 22, 1966
Decided July 7, 1966.
Milton S. Gould, Roy M. Cohn, Bernard D. Fischman, Michael Leschnitzer, Stuart Silfen and Frank Polestino for appellants-respondents.
J. Lee Rankin, Corporation Counsel (Morris Handel, Morris Einhorn and Milton H. Harris of counsel), for respondent-appellant.
Judges FULD, VAN VOORHIS and SCILEPPI concur with Judge BURKE; Judge KEATING dissents in an opinion in which Chief Judge DESMOND and Judge BERGAN concur.
*217 BURKE, J.
The only issue presented on this appeal which calls for a modification is the reliance of the courts below on erroneous principles of law regarding the evaluation of the *218 condemnees' intangible property. The theory relied upon is unrealistic, resulting in the denial of the just compensation to which claimants are entitled under the Constitution. The present award is sufficient only as compensation for the value of the tangible property taken.
The problems raised in this condemnation proceeding are difficult and to a degree unique. In this era of spiraling inflation such proceedings will continually reoccur since it is beyond the resources of private enterprise to provide mass transportation at modest rates, dictated by political exigencies and confiscatory as far as the equity in the business is concerned. However, "It does not rest with the public, taking the property through Congress or the Legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation." (Monongahela Nav. Co. v. United States, 148 U. S. 312, 327 [1893]; Railway Steel Spring Co. v. Chicago & E. I. R. Co., 261 F. 690 [U. S. Dist. Ct., N. D., Ill., 1919]; Matter of City of New York, 190 N.Y. 350, 353 [1907].) However laudable the political motivation is in depriving claimants of their transportation system, they must be fully compensated therefor. In Matter of New York Edison Co. v. Maltbie (244 App. Div. 436, 442 [3d Dept., 1935]) the court stated: "This announcement indicates a motive to be generous toward needy rate payers with the money and property belonging to the utility companies. Some may regard this as desirable and the motive as praiseworthy, but `the point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute.' (Panama Refining Co. v. Ryan, 293 U. S. 388, 420 * * *.)"
The right to a reasonable fare is part of all franchise contracts. (People ex rel. City of New York v. Nixon, 229 N.Y. 356 [1920].) As this court stated in People ex rel. Kings County Light. Co. v. Willcox (210 N.Y. 479, 491 [1914]): "The right to limit the corporation to a fair return fixed by public authority necessarily involves the correlative right in the corporation to be assured of that fair return during all the time that its capital is employed in the public service." In Matter of Queens-Nassau Tr. Lines v. Maltbie (186 Misc. 424 [Sup. Ct., Albany County, 1946], affd. 271 App. Div. 81 [3d Dept., 1946], affd. without opn. 296 N.Y. 893, 894, 896, 898, 899, 901 [1947]), the court held *219 that the Public Service Commission had jurisdiction over omnibus rates and accordingly was bound to permit claimants to charge a reasonable and compensatory fare notwithstanding any contrary provisions contained in the franchise agreements. The predecessors of claimants herein were parties to Maltbie and the franchise contracts herein were among those there in issue. Thus fare increases were granted to claimants by the Public Service Commission in 1948 and 1949. The Public Service Commission stated in Matter of Lester T. Doyle, Trustee (11 PUR 3d 491, 497-498 [N. Y. Pub. Serv. Comm., 1956]): "We do not fix the rates of this system [the Third Avenue system] as a whole. Except for the relatively minor operations in Westchester county they are fixed by the city of New York. The applicable statute imposes the same duties upon the city as upon the commission. Rates for bus companies under the Public Service Law (§ 63-b) are based upon capital actually expended. The city of New York stated on the argument before us that it is the intention of the city to treat the company fairly and to adjust its rates to meet its needs. Since that time the city has acted to keep this commitment."
After the rate regulating authority was transferred to the city the Board of Estimate granted the following increases in fares to claimants:

 7/1/50 New York City Omnibus 7¢ to 8¢
 7/1/50 Surface Transportation 8¢ to 10¢
 1/1/51 New York City Omnibus 8¢ to 10¢
 1/1/54 Surface Transportation 10¢ to 13¢
 1/1/54 Fifth Avenue 12¢ to 15¢
 1/1/54 New York City Omnibus 10¢ to 13¢
 1/1/56 Surface Transportation 13¢ to 15¢
 1/1/56 New York City Omnibus 13¢ to 15¢

Hence it is clear that the statute did not constitutionally deprive claimants of their previously existing right to reasonable fares, but placed the duty to respect such rights upon the city acting either as a regulatory body or as a contracting party.
The claimants operated the nation's two largest privately owned transit systems. Fifth operated 28 routes in Manhattan for an annual total of 22,000,000 revenue bus miles. Surface operated 49 routes in Manhattan and The Bronx for over 24,000,000 revenue bus miles per year. Surface provided all the *220 surface transportation by public carrier in The Bronx except for a minor Transit Authority service over the Whitestone Bridge. Fifth provided virtually all the franchised surface transit in Manhattan. Each working day of the year they transported about 1,250,000 passengers. The transit system served a major portion of the largest city and the best transit market in the United States. To some degree this bountiful market results from the fact that the per capita ownership of automobiles in New York County and Bronx County, the two areas served by claimants, is lower than in any other major urban county in the United States. It follows, therefore, that the respondent took the claimants' transit systems as going concerns and has operated them as such ever since. The maintenance by the city of this transportation service demonstrates that the bus system is essential and complementary to, not competitive with, the overcrowded, inadequate subway system.
In fixing the award at $30,353,542 the trial court used reproduction cost new less depreciation, but the court improperly rejected the evidence proffered by the claimants as to the value of the intangible going concern assets, that is, the component of value in the business which in addition to the value of the tangible assets reflects an efficient operation. In disallowing pensions, mortgages, Federal and city taxes, equipment and bond indebtedness, all current obligations in excess of $19,000,000, the trial court treated the take over as one of a going concern. These, of course, are the usual debts which are paid for out of the earnings of a going concern and similar debts are normally incurred by the going concern in the course of its continuing business. But there is a basic inconsistency in then applying a principle that no payment for seized going concern assets should be made when the continuance of earnings is shut off by condemnation. The reason given below is that where there is no earning capacity, even if only because the rates permitted to be charged are unreasonably low, there is no going concern value. However, in all the cases supporting the view that where there is no earning capacity there is no going concern value, the condemnees were inherently incapable of profitable operation because of the economic law of diminishing returns or inefficient management. Here had the city not suppressed the earning power of these transit lines by denying them, for *221 political reasons, the right to charge an increased and reasonable fare, they would have had large gains in gross revenues and greater gains in net profits as going concerns at the time of condemnation.
This record shows that every recent rise in fare on claimants' lines resulted in increases in profits even while claimants experienced a slight decline in passengers carried. The general experience in the transit industry in the United States has followed a pattern that for every 10% increase in fare there is only a 3% loss in traffic. Accordingly the increase in revenue attributable to a fare rise far outbalances the decrease in revenue attributable to a concomitant passenger loss. Indeed the Transit Authority stated with respect to this nationwide pattern that "the average losses based on experiences in smaller cities are likely to be higher than might be expected in N. Y. City where the automobile is probably not as serious a competitor."
Thus the record demonstrates claimants' capability for profitable operations under reasonable rates and they are, therefore, entitled to going concern value (Kimball Laundry Co. v. United States, 338 U. S. 1, 19 [1949]; National Waterworks Co. v. Kansas City, 62 F. 853 [C. C. A. 8th, 1894]; People ex rel. Kings County Light. Co. v. Willcox, 210 N.Y. 479, supra [1914]).
The measure of value in this case is the cost of putting the entire transit systems together new plus all improvements, tangible and intangible, less depreciation. The cost of organizing and systematizing an enterprise in these days is many times the cost of a half a century ago. Consequently, the going concern's intangible assets are equally as essential to the city's ability to furnish bus service as are the tangible assets seized and used. These going concern attributes or so-called intangible assets such as coach routes, operating schedules, operating records and systems of procedures and trained personnel made it possible for the city to operate the transit system the day after the condemnation. Under the theory erroneously followed below, the assets in which the owners of the bus systems had invested substantial sums could be taken without compensation. These assets, without which the city would not have operated the system, can no more be taken without compensation than can its tangible corporate property.
*222 In condemnation cases it is "necessary to appraise the physical property and the going value separately, and of course that is the case if the cost of reproduction rule be adopted." (People ex rel. Kings County Light. Co. v. Willcox, 210 N.Y. 479, 492, supra.) The rule was well defined in International Ry. Co. v. Prendergast (1 F.Supp. 623, 629 [U. S. Dist. Ct., W. D. N. Y., 1932]): "In obtaining reproduction cost new, the value of the business as complete and ready to begin operations is ascertained. There must be added a going value, the value of the plant not as it is ready to begin operation, but the additional value which accrues because the plant is in operation with customers acquired." Such increments for going concern value in addition to an award for tangible assets (valued at reproduction cost) must be allowed. (Omaha v. Omaha Water Co., 218 U. S. 180, 191-192 [1910]; McCardle v. Indianapolis Water Co., 272 U. S. 400 [1926]; Georgia Ry. v. Railroad Comm., 262 U. S. 625 [1923]; Bluefield Co. v. Public Serv. Comm., 262 U. S. 679, 686 [1923]; Denver v. Denver Union Water Co., 246 U. S. 178, 191-192 [1918]; Knoxville v. Water Co., 212 U. S. 1 [1909]; Los Angeles Gas & Elec. Corp. v. Railroad Comm., 58 F.2d 256, 271 [U. S. Dist. Ct., S. D. Cal., 1932]; Denver Union Stock Yard Co. v. United States, 57 F.2d 735, 744 [U. S. Dist. Ct., D. Col., 1932].) Indeed the majority of the court below recognized this and stated that the trial court had taken the going concern items into consideration in reaching its conclusion. In making this statement, the Appellate Division erred for it is clear that the trial court did not take the going concern items into account. In point of fact, it so indicated when, in the portion of its opinion devoted to "Going Concern Values" (46 Misc 2d 14, 25 et seq.), it declared "No allowance may be made for Surface's operating rights and permits nor for Fifth's perpetual franchises for the reasons already stated in the discussion of the Nixon case [229 N.Y. 356, supra]. The other items [coach routes, operating schedules, etc.] are not supported by the cases urged by claimants." (46 Misc 2d, p. 26.) If there could be any doubt as to the meaning of this excerpt, it is dispelled by a reading of the entire discussion concerning going concern value, for it is plainly stated that the only award made was for the reproduction cost less depreciation. It follows therefore that no allowance was made for the going concern items.
*223 And this is precisely the thrust of Justice RABIN'S dissent (23 A D 2d 463, 468-469):
"While, in an attempt to reflect `going value', the court appraised the real property, buses and other personal property on the basis of a depreciated reproduction cost rather than a `break-up' market value, to my mind that does not fully reflect `going value'. And I see no reason why the valuation should be so limited. The city's only expert witness on the subject of going value  Mr. Edward A. Roberts  authored a book entitled `Fair Value, Going Value, et al. of a Bus Utility.' In this work he clearly indicates that giving `reproduction cost new less depreciation' does not constitute compensation for `going value'. He calls such compensation an award for merely the `bare bones value of a business property'. I accept and agree with that statement of the city's expert.
"It should be noted that Mr. Roberts did not refer to `break-up' value as being `bare bones' value. He was referring to value arrived at through the `reproduction costs new less depreciation' method as being `bare bones' value. And that is all that Special Term gave. And that is exactly what the city's expert said does not constitute going value."
The argument made by the respondent that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospects was made long ago and rejected. (See Matter of City of New York [New York Water Serv. Corp.], 275 App. Div. 785 [2d Dept., 1949], mot. for lv. to app. den. 299 N.Y. 797 [1949].) In the New York Water Serv. Corp. case, which involved the condemnation of the Flatbush water supply, where that identical contention was advanced, the Appellate Division approved an allowance for going concern value in addition to compensation for tangible assets valued at reproduction cost new less depreciation.
In the case before us, claimants' property was a viable operative transit system and was taken as such, with a clearly expressed intent to so operate it after the forced transfer of title. Despite its annual transportation of a half billion riders, it had been approved by the city for eight years as safe and adequate. Claimants' undeniably competent and efficient personnel were taken over by the city along with claimants' routes, franchises, operating schedules, accounting and maintenance *224 records, etc.  all going concern assets for which claimants must be duly compensated.
Accordingly the order appealed from should be modified, the matter remanded to Special Term for a determination of the value of the going concern assets as an addition to the amount heretofore awarded and, as so modified, affirmed, with costs.
KEATING, J. (dissenting).
When private property is taken for public use, our State and Federal Constitutions alike mandate the payment of "just compensation" (N. Y. Const., art. I, § 7; U. S. Const., 5th Amdt.). They do not require the payment of a windfall, nor, in arriving at "just compensation", do they require the courts to ignore the economic and political realities which faced the condemnees in the course of their normal existence during the many years preceding condemnation.
Much as we may sympathize with the plight of an economically unfortunate corporate operation, we may not sweep that misfortune away in a condemnation proceeding by ignoring the causes which gave rise to it.
Our business is to arrive at "just compensation", no more and no less. Elusive as that concept may be at times (see Banner Milling Co. v. State of New York, 240 N.Y. 533, 546) there are, nonetheless, well established guidelines for us to follow.
First, it is axiomatic that the measure of compensation for property taken is the owner's loss and not the taker's gain (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195; Kimball Laundry Co. v. United States, 338 U. S. 1, 5; McGovern v. New York, 229 U. S. 363). In its application to this case, this simply means that we must look to the value of what the condemnees have lost and not to the value of what the condemnor has gained.
Second and somewhat corrollary to the above is the rule that the condemnees may not demand an artificial or inflated value based on the public need. This is commonly referred to as "hold-up" value and it is universally rejected as a measure of compensation (Matter of Simmons, 130 App. Div. 356, affd. 195 N.Y. 573, affd. sub nom. McGovern v. New York, 229 U. S. 363, supra; United States v. Cors, 337 U. S. 325, 333-334). However, this does not mean that the inherent value of the transit systems for public use must be disregarded. The properties here being condemned were, from the beginning, brought into *225 existence by private interests to serve the public need for mass transportation. They served the public need on the date of condemnation and their facilities continue to do so today. To this limited extent they have and always have had a real value to the condemnees, which may be taken into consideration in arriving at a final award. This is clearly distinguishable from an inflated and artificial "hold-up" value which suddenly comes into being with the announced condemnation.
Thus, we come to the question of how we are to determine value to the condemnees. The usual formula is to determine what a willing buyer would pay to a willing seller in an arms' length transaction. Obviously, since every condemnation is, in effect, a forced sale, courts must make an informed judgment upon all the available evidence as to what a hypothetical willing buyer would probably pay to a hypothetical willing seller. This is precisely what the courts below said they were doing and, in fact, did.
The value of the tangible assets, buses, garages, real estate, fixtures and all other equipment, was considered. A buyer would pay for these and so too must the city.
In addition, there is real value attributable to the fact that these tangible assets are not isolated units. They are fully integrated and operating transit systems, held together by personnel available and working, franchises, operating schedules, established routes, accounting and maintenance records and all of the other elements which spell the difference between "bare bones" and a transportation system in operation. These are but elements of a "going concern" for which a buyer would willingly pay. The city, which took them, must pay for them and has paid for them rather generously. As elements of a business which have value, it is only proper that they should be considered part of the "just compensation" to which the condemnees are entitled and so the case law has consistently held (Kimball Laundry Co. v. United States, 338 U. S. 1, supra; Banner Milling Co. v. State of New York, 240 N.Y. 533, 544, supra; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 164-165; Omaha v. Omaha Water Co., 218 U. S. 180, 202; Denver v. Denver Union Water Co., 246 U. S. 178, 191).
The majority opinion states (p. 218) that "The present award is sufficient only as compensation for the value of the *226 tangible property taken." This manifestly cannot be so. The final award as affirmed by the Appellate Division was $30,353,542. The city, on its appeal to this court, claims that the award should not have exceeded $20,700,000.
To the extent that the claimants were integrated, synchronized and functioning operations, they were specifically compensated by Special Term (46 Misc 2d 14, 25). The Appellate Division recognized this (23 A D 2d 463, 467): "The break-up or `bare bones' value of the physical assets, except perhaps for the real estate, would have been greatly less than the amount fixed by Special Term. Had claimants voluntarily discontinued operations and sought to sell their real estate and personalty, they would have been fortunate to realize the amount which the city on its cross appeals asserts should have been awarded  namely, two thirds of the award".
There cannot be any doubt but that the Appellate Division, in the exercise of its jurisdiction to review the facts, would not have sustained a $30,353,542 award for the physical assets alone, and there is no basis for our doing so in the first instance.
If we return now to our hypothetical buyer, we must ask, somewhat rhetorically, whether he would pay for something which he did not take, which he did not receive and which, in fact, neither existed nor had a potential for ever coming into existence. This crucial element is the ability to earn money, that most precious commodity which, in all but the case of a philanthropist or a unit of government, brings the buyer into the market place to begin with.
A willing buyer will pay substantial sums for a business which earns money. A business which does not and cannot be brought to the point at which it brings its owner a reasonable return on his investment has no "earnings" element of going-concern value (Matter of City of New York, 265 N.Y. 170, affd. sub nom. Roberts v. New York City, 295 U. S. 264; Kimball Laundry Co. v. United States, 338 U. S. 1, supra) for which a buyer will pay. In such a situation, no good reason appears why the city should have to pay for a non-existent element.
The evidence in this case abundantly establishes that, at the 15 cents fare per passenger, the claimant transit companies were not earning and were not capable of earning money. In 1961, the year preceding condemnation, claimant Fifth Avenue Coach *227 Lines, Inc., had a deficit of $300,000 after taxes and claimant Surface Transit, Inc., had a net income of $90,000 after taxes. For the three years preceding condemnation, Fifth's average net income after taxes was $27,000 and Surface's was $552,000. Average net operating income (pre-taxes) for the 10 years preceding condemnation was $3.2 millions for the two companies combined. These figures include $20 millions in subsidies to supplement the fare box in the seven years preceding condemnation.
In 1962, claimants' president wrote to the Board of Estimate that claimants "are in a serious and critical financial condition. Petitioners in 1961 had a loss of $721,410. The loss for January of 1962 is approximately $500,000. Based upon results thus far this year, petitioners estimate that they will have a loss in 1962, in excess of six million dollars."
The majority does not dispute these findings of fact made by both courts below. Rather, they recognize them, but insist, nonetheless, that the city must pay as if there were profits and this is on the theory that claimants had a right to make a profit (by raising the fare) and that "had the city not suppressed the earning power of these transit lines by denying them, for political reasons, the right to charge an increased and reasonable fare, they would have had large gains in gross revenues and greater gains in net profits as going concerns at the time of condemnation." (Pp. 220-221.)
In my view, neither of these arguments square with the facts or the applicable law.
We may note that as of this writing, four years after the taking in question, the transit fare has just been increased from 15 cents to 20 cents. Notwithstanding this recent increase, value in a condemnation proceeding is calculated as of the date of the taking and not as of a future date four years later.
Political considerations, in this case the pocketbook of the millions of New Yorker's who use the transit system daily, are not to be shrugged off lightly. This was a fact of life with which the claimants were required to contend throughout their operating existence. The announcement of condemnation did not herald an end to their burden  at least it should not with regard to valuation. As Special Term said in respect to claimants' asserted right to be valued at a higher fare: "The complete *228 answer is that, during the entire 10-year period while claimants' earnings before income taxes average only about $3.2 millions on a business alleged to be worth $92.5 millions, they had whatever right they now contend for, yet they failed to assert it. This must have been because they recognized that they could not overcome the practical or legal obstacles or both. They have not shown any greater chance of success at this time" (46 Misc 2d 14, 21).
Moreover, there is not the slightest iota of evidence to establish that the city suppressed the earning ability of these claimants in order to take them over at a lower cost. Just as the city may not depress value in contemplation of condemnation so, too, the claimants may not employ condemnation for the purpose of enhancing their own value (Matter of City of New York [Inwood Hill Park], 230 App. Div. 41, 43-44, 46-47, affd. 256 N.Y. 556).
Among the practical and legal obstacles to increased earnings are the circumstances that: (1) the franchises pursuant to which the claimants operated were nonexclusive and were in direct competition with the city's transit facilities. 68% of Fifth's revenues and 62% of Surface's revenues were from routes competitive with the city's system and the claimants could not reasonably expect passengers to pay a higher fare on one than on the other; (2) the franchise agreements expressly reserved to the city the right of termination in the event fares were increased without the consent of the Board of Estimate. This alone is enough to prevent the claimants from asserting the right to be valued on the basis of a higher fare; and (3) as I have already noted, even the hypothetical right to a higher fare would not affect the award since it is the condemnees' earnings on the date of taking, rather than a speculative rate at a speculative date in the future, which are relevant. (Olson v. United States, 292 U. S. 246, 257.)
The claimants' asserted right to a higher fare in any event seems equally groundless. The ground upon which it is urged is that the city, which controls the fare by virtue of a transfer of jurisdiction to it from the Public Service Commission (Public Service Law, § 5-d), is obligated, as the new regulatory agency, to permit claimants to charge a compensatory fare.
*229 Section 5-d of the Public Service Law provides in relevant part that "The rates of fare on any such omnibus lines shall be those established pursuant to any contract, franchise or consent heretofore or hereafter made between the omnibus corporations operating such lines and such city".
It is clear that the Legislature may withdraw the jurisdiction of a regulatory agency and leave the parties to the terms of their franchise agreement (Matter of Village of Mamaroneck v. Public Serv. Comm., 208 App. Div. 330, affd. 238 N.Y. 588) but, in the final analysis, that question is not controlling for, in fact, the claimants never asserted a right to a higher fare prior to condemnation, and they may not do so after condemnation has become a reality. Moreover, the claimants had no right to be free from the city's competition (Hamilton Gas Light Co. v. Hamilton City, 146 U. S. 258, 268) and the mere fact of regulation did not assure them of the right to make a profit (Power Comm. v. Hope Gas Co., 320 U. S. 591, 603). The following quote from Market St. Ry. Co. v. Comm. (324 U. S. 548, 567) is relevant: "[I]t may be safely generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, or on an investment after it has vanished, even if once prudently made * * * The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces." (Emphasis added.)
This, in substance, is the basis for my dissent. In no case that I have found have the courts required a condemnor to pay for something which was not taken and which did not exist. Condemnation requires "just compensation" but "just" has reference to condemnor as well as condemnee.
Where a profitable business is not taken and where it is shown that the business is not reasonably capable of profitable operation by reason of economic forces, no compensation may be allowed therefor (Matter of City of New York, 265 N.Y. 170, affd. sub nom. Roberts v. New York City, 295 U. S. 264, supra; *230 Matter of City of New York [Sixth Ave. El. R. R.], 265 App. Div. 200, 206-207). Of course, in this connection it makes no difference at all that the claimants operated "the nations two largest privately owned transit systems." They would have been worth more with smaller systems and larger earnings. As Mr. Justice CARDOZO said in Roberts v. New York City (supra, p. 282), "Substantial prices are not paid for the privilege of conducting a business at a loss."
Since I believe that at $30,353,542 the claimants have already received far in excess of that which they could have reasonably anticipated from a willing purchaser, I think they are entitled to no more for nonexistent profit potential.
Accordingly, I would affirm the orders of the Appellate Division.
Order modified and, as so modified, affirmed, with costs to claimants, and case remitted to Special Term for further proceedings in accordance with the opinion herein.